**UNITED STATES of America,**
**Libelant,**

v.

An **ARTICLE OF DRUG** consisting of approximately 69 100-tablet bottles, 2 500-tablet bottles and 2 1000-tablet bottles, **LABELED** in part:

(Btl.)

"—DECHOLIN—Each tablet contains Dehydrocholic Acid 250 mg. (3¾ grains) —Ames Company, Inc., Elkhart, Indiana —Indications: Indigestion—After Meal Discomfort and Fullness—Excessive Belching—Constipation—Control No.—"

and

Miles Laboratories, Inc. (as successor to Ames Company, Inc.), Claimant.

Civ. A. No. 24029.

United States District Court
E. D. Michigan, S. D.

Feb. 10, 1967.

474

Walter E. Byerley, Dept. of Health, Education & Welfare, Food and Drug Division, Washington, D. C., Milton J. Trumbauer, Asst. U. S. Atty., Detroit, Mich., for libelant.

Bruce J. Brennan, Washington, D. C., John B. Buckley, Elkhart, Ind., John K. Worley, Detroit, Mich., for claimant.

## OPINION

FREEMAN, District Judge.

These cross motions for summary judgment, pressed by the United States and the claimant, present significant questions of first impression under the 1951 amendment to the Federal Food, Drug and Cosmetic Act.

The Government commenced the case by filing a libel of information for condemnation of seventy-three packages bearing appproximately ten thousand tablets, each of which contained 250 milligrams (3¾ grains) of dehydrocholic acid and was marketed under the trade name "Decholin." Ames Company, Inc., the manufacturer of Decholin, intervened in this *in rem* proceeding as claimant of the seized articles.[1]

The action is predicated upon Federal Food, Drug and Cosmetic Act, § 304, as amended, 21 U.S.C. § 334, providing:

"Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce * * * shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found * * *."

The only substantive provision of concern is Federal Food, Drug and Cosmetic Act, § 503, as amended, 21 U.S.C. § 353, reading in pertinent part:

"(b) (1) A drug intended for use by man which—

\* \* \* \* \* \*

(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use; is not safe for use except under the supervision of a practitioner licensed by law to administer such drug * * *

(C) * * * shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. \* \* \*

(4) A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement 'Caution: Federal law prohibits dispensing without prescription'. A drug to which paragraph (1) of this subsection does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears the caution statement quoted in the preceding sentence."

It is agreed that Decholin is a drug within the meaning of the Act and that the seized tablets had moved in interstate commerce. It is also undisputed that the labels on the libeled packages give no indication that Decholin may not lawfully be dispensed without prescription. The precise legal consideration raised by these motions is whether amended section 503 causes Decholin to be misbranded because its containers fail to carry such a precautionary statement.

Since the Decholin label is the center of this controversy, its material contents are set forth at this point. The printed matter on one side of each of the seized packages reads insofar as relevant:

"Decholin Brand

Dehydrocholic Acid, Ames

250 mg. (3¾ gr.) contained in each tablet."

The reverse side of the containers gives this additional information:

"INDICATIONS

"Indigestion . . . after-meal discomfort and fullness (particularly after

1. When the libel was filed, Ames Company, Inc. was a wholly owned subsidiary of Miles Laboratories, Inc. On December 31, 1965, Miles acquired the assets of Ames; and on January 20, 1966, it adopted Ames' claim in this action. Nevertheless, for purposes of this opinion, Ames will still be treated as the claimant.

fatty meals) . . . excessive belching . . . constipation.

## "AVERAGE ADULT DOSE:

"One or two tablets, three times daily or as directed by physician.

## "CAUTION:

"Consult your physician should symptoms persist or severe abdominal pain, nausea and vomiting appear.

## "KEEP THIS AND ALL MEDICATIONS OUT OF THE REACH OF CHILDREN."

In support of its request for summary judgment, each movant relies almost exclusively upon a number of affidavits which it has procured. These include the statements of qualified physicians specializing in gastroenterology, several of whom are on the faculties of leading medical schools, relative to whether harm can come to a layman who, without consulting a medical practitioner, takes Decholin for relief of the indicative symptoms listed above. The claimant also calls attention to the fact that, in answer to claimant's interrogatories, the United States has admitted that it is unaware of any actual case in which a layman was injured under these circumstances.

There is only one fundamental issue presented by these motions: is Decholin unsafe as a drug intended for human use without a prescription? Nevertheless, recognizing that in section 503(b) (1) (B) Congress listed a number of ostensibly different reasons why a drug may be unsafe for self-medication and attempting to deal with the parties' arguments in an organized fashion, the motions will be viewed as raising two issues. First, is the pharmacological effect of Decholin such that, unless it is taken pursuant to and in accordance with a physician's directions, reactions sufficient to

cause the product to be unsafe may result from its ingestion? This will be called the "toxicity question." [2] Second, does the fact that Decholin may be taken by a person who, although experiencing the indications set out on the label, has an ailment which Decholin cannot cure, coupled with the fact such an individual may postpone a visit to his physician in reliance upon the over-the-counter availability of Decholin, cause the drug to be unsafe? Because the gist of the Government's argument on this issue is that an immediate professional diagnosis to detect the underlying cause of the symptoms in a particular case is a step which must precede or accompany use in order for the drug to be considered safe, this point will be called the collateral measures question. Unfortunately, some of the subissues and contentions underlying each of these two topics are so similar that the effort to pinpoint two distinct inquiries will not be totally successful.

At the basis of both questions lies the fact that the indications mentioned on the Decholin container can stem from any one of what, for present purposes, will be considered as three types of causes: biliary tract obstruction, organic disease and various minor factors. These last include a host of elements ranging from pregnancy through dietary indiscretions, such as skipping meals, and on to old age. Claimant willingly agrees with the Government that Decholin would not be prescribed by a physician to cure either a tract obstruction or an organic disease.

### Toxicity Question

If the record showed clearly why a practitioner would not order Decholin for a person suffering from an obstruction or an organic disease, the toxicity question could be in a better posture for summary disposition. However, the affidavits of the experts suggest different rea-

2. The term "toxicity question" is a label of convenience. Its use to denominate the first inquiry should not be taken as an indication that the Government can prevail on this issue only if it can establish that Decholin is toxic in the dictionary sense. For present purposes, the word "toxicity" should be viewed as meaning state of being a potential source of harm for any reason directly attributable to its ingredients rather than "state * * * of being * * * poisonous," as defined in Webster's New International Dictionary, Second Edition.

sons which may be grounded upon conflicting views on a factual issue, the pharmacological effect of the drug. The statements of claimant's authorities suggest that they would not prescribe Decholin in the presence of one of these major ailments primarily, if not exclusively, just because the drug would do no good for the patient. However, these experts are quick to point out that they have never heard of an instance in which a person with either an obstruction or an organic disease sustained any ill effect from self-medication with Decholin; and at least several of them doubt that harm would ever come to an individual who takes the drug under these circumstances. Therefore, Ames would consider Decholin safe for unrestricted distribution.

While all of the Government's experts also assert that Decholin is ineffective to relieve either a tract obstruction or an organic disease, and while they agree among themselves that the drug is unsafe unless taken on a physician's advice —a proposition which insofar as it attempts to state a legal conclusion is not, of course, for them to express,—the affidavit of Dr. Manuel Sklar, an assistant professor of clinical medicine at Wayne State University, is most helpful in showing why the Government considers the drug properly dispensed only on prescription. He believes that the consumption of Decholin by an individual who has an obstruction would lead to an increase in the accumulation of bile ahead of the intestine, and because of the blockage, the fluid could not pass into the intestine as it normally would during the course of digestion. Furthermore, according to Dr. Sklar, the accumulated bile will eventually become absorbed into the bloodstream, leading to the likelihood of serious harm. Although he does not explicitly say so, doubtless this expert would see a potentiality for the same end result if Decholin were taken by a person with at least those organic diseases which affect the ability of the body to handle bile flow in the usual manner. Therefore, in his opinion, the product solely by virtue

of its composition can be injurious to an individual with an ailment giving rise to Decholin's indications but beyond Decholin's power to cure.

The root of Dr. Sklar's hypothesis is possibly a belief that Decholin serves as a whole bile-producing medicine or, in his words, as a "choleretic." This view appears to be shared by the other Government authorities, who seem to consider Decholin as the equivalent of a bile salt. On the other hand, Ames' brief stresses that Decholin is different from bile salts and its affidavit of Dr. G. Gordon McHardy, formerly of the faculty of the Tulane University School of Medicine and the only one of claimant's experts who attempted to describe the specific function of Decholin, refers to the drug as a "hydrocholeretic," an agent which only "increases the watery component of the bile."

It seems incredible that physicians of such stature cannot agree on the most rudimentary effect upon the bodily processes of the ingestion of 3¾ grains of dehydrocholic acid. Since Dr. McHardy and claimant's attorneys are so adamant in calling Decholin a "hydrocholeretic," it seems possible that Dr. Sklar either used the term "choleretic" in a loose sense or feels that there is no significant difference between an increase of whole bile in the system and an additional amount of the watery element in the presence of a constant quantity of the other bile components. Nevertheless, as the record stands at this time, a conflict does exist between the parties over the question whether Decholin is a "choleretic" or a "hydrocholeretic."

Of course, if they were agreed that the drug is a "hydrocholeretic," it would be impossible even to grant summary judgment to either movant limited to the toxicity question. There remain the opposing contentions why a practitioner would not recommend Decholin in some cases, and beneath these antagonistic positions lies another and more subtle conflict which has great significance with regard to the proper interpretation of section 503(b) (1) (B). Although this dispute

is not formally expressed in the record, a critical study of the affidavits leaves little doubt that it is nonetheless real. Broadly speaking, it could be said to center around the issue whether a drug's potentiality for causing harm if taken without prescription should be considered from a theoretical or a practical viewpoint.

Even the Government's most helpful spokesman, Dr. Sklar, did not mention that he knew or had heard of a case in which Decholin or any article of similar composition had done harm in any perceptible degree to a layman who had taken the preparation, without consulting a physician, upon experiencing the indications listed on the Decholin label. This is not surprising since the Government admitted in answer to interrogatories that it knew of no actual cases of harm attributable to the product.[3] On the other hand, statements made by three of claimant's experts leave the strong impression that the principal reason why they would consider Decholin safe for self-medication is the fact that their experiences have taught them that a person suffering from an organic disease or a biliary tract obstruction will feel so ill that, as a matter of course, he will seek professional help. Therefore, claimant's experts do not seem to be so much of the opinion that home treatment with Decholin *cannot* cause harm as they do of the view that it *will not;* whereas the Government's affiants stress that Decholin could cause harm to the uninformed lay user, while the Government itself all but concedes that if future unadvised laymen act as their predecessors have, the drug will not be responsible for any serious consequences. In short, if the affidavits were to become the basis of an educated guess, it would be that the moving parties are not as far apart as one may at first surmise and that both would be forced to agree that while in theory Decholin may be harmful as an over-the-counter drug, in practice it is safe for use without prescription.

Even if it were apparent from the record that both sides conceded the theoretical possibility of harm from self-medication with Decholin but admitted that, as a practical matter, the likelihood of ill effects is virtually nonexistent, the Court would not feel confident in granting either motion until it has been made aware of the nature of the factors which claimant would say separate the practical order from the theoretical. This is particularly true where, as here and probably in any case of this nature, all conclusions concerning the practical realm depend upon observations of past events, while the Government's purpose in bringing suit is fundamentally to prevent future injury.

The legislative history of the 1951 amendment, which gave birth to section 503(b) (1) (B), shows that Congress did not desire to proscribe self-medication with a product just because under some set of circumstances—and especially hypothetical conditions—the drug may be harmful if taken without professional supervision. At one point in the debate in the House on the proposed amendment, Representative Wolverton, of New Jersey, a member of the committee which had studied the bill and one of its proponents, sought to explain its meaning to the membership by answering a series of questions which he had prepared. Part of the monologue follows:

"Thirty-seventh question: Does this bill make it possible for the Administrator to put such household remedies, as bromo-seltzer, milk of magnesia, and citra carbonate on prescription?

"Answer: Of course not. It requires the Administrator to respect the opinions generally held that these articles

---

3. The record shows that the use of Decholin-type medicines has been extensive. Since 1926, claimant and its pred- ecessor corporations alone have sold over six-tenths of a billion dehydrocholic acid tablets under one or another tradename.

are safe for self-medication."
97 Cong.Rec. 9532.[4]

Despite Mr. Wolverton's confidence in the safety of the three products mentioned, it is a matter of common knowledge that first-aid charts regularly warn that milk of magnesia or any laxative is never to be administered to a person who is suspicioned to be suffering from an attack of appendicitis.

Those in opposition to the amendment understood the critical provision in the same light. Representative Wood, of Idaho, a medical practitioner for almost half a century, thought that it was foolish to attempt to legislate on the self-medication question on the federal level. In the course of his remarks, he made this observation:

"As an illustration of how difficult it is to determine the correct answer to this problem [the safe for non-prescription use issue] * * * may be mentioned the fact that even a simple and harmless drug may be potent for harm under conditions which could only be determined by the physician in actual attendance on the patient. Even such simple things as salt, which could never be classed in that category, might shorten life in a case of dropsy, even in the amounts customarily used at the table.

"Aspirin is not a dangerous drug, yet I cannot take even one tablet without

vomiting. Penicillin is not generally classed as one of the more dangerous drugs, yet one of our most valued Republican Congressmen is in the hospital right now suffering from a severe allergy from even one dose." 97 Cong. Rec. 9555.

In fact, throughout the entire House debate runs the theme that "common household remedies" were not meant to be taken off the over-the-counter market. Since the Court is unwilling to presume that the lawmakers were merely engaging in an afternoon of question-begging disputation, it feels that there are some drugs which rather easily fall into this category. They must be the thousand and one articles which most physicians would consider perfectly harmless when taken in the normal course of events by a person with a modicum of common sense. Nevertheless, it is hard to imagine that under no circumstances could any of these drugs do serious harm to an individual who does not appreciate the nature of the cause which lies at the root of his symptoms.

The Senate Committee, which studied the bill after it had passed the House in practically the same form as that in which it finally became law, had this to say:

"The word 'safe,' as used in the definition [in what is now section 503(b) (1) (B)], is intended to have its ordinary

---

4. All citations to the Congressional Record refer to the daily edition of August 1, 1951.

At the time these and all other remarks quoted in this opinion from the Congressional Record were made on the floor of the House, the forerunner of that language which eventually became section 503(b) (1) (B) read:

"because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, has been determined by the Administrator [of the Federal Security Agency], on the basis of opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy of such drug * * * to be safe and efficacious for use only after professional diagnosis by, or un-

der the supervision of, a practitioner licensed by law to administer such drug * * *"

This language was not in the bill as originally introduced, but was suggested in an amendment proposed by the House Committee on Interstate and Foreign Commerce, which had studied the measure prior to debate in the House. See 97 Cong.Rec. 9543.

It is apparent from a comparison of the above wording with that now contained in the statute that the tests for determining a drug's safety were not changed during the bill's consideration by the Congress, although the Judiciary and not the Federal Security Administrator was finally commissioned to apply these standards.

meaning. For example, non-toxic drugs like quinidine sulfate, intended for heart disease, or penicillin, for infections, are not safe for self-medication because their unsupervised use may indirectly cause injury or death." S.Rep.No.946, 82d Cong., 1st Sess. 4 (1951), U.S.Code Cong. & Admin. News 1951, p. 2454.[5]

At first glance it could appear that the second sentence of the excerpt is inconsistent with the first, as well as with one of the overall purposes of the legislation, which was to permit over-the-counter sales of drugs unless they clearly belong in the "prescription only" category. See H.R.Rep.No.700, 82d Cong., 1st Sess. 2–3 (1951). However, careful reflection on the language of the latter sentence should dispel this impression. The Committee spoke of a drug which is dangerous unless its use is superintended, and not of one which may cause harm if its administration is irrational, careless or imprudent.

■■ On the basis of this passage, it seems evident that the Committee thought that it was recommending passage of a bill which would take a drug out of unrestricted distribution only if it is hazardous for the reason that there is more than a remote possibility that it will cause harm when used in a reasonable manner. If, in attempting to evaluate a drug, a court were to consider every contingency and take account of the immaturity or stupidity of every potential user, it would not be paying heed to the Committee's desire that it give to the word "safe" the ordinary meaning. Similarly, it seems that the Government, in order to prevail in this case, must establish that Decholin has a potentiality for causing consequences for an unadvised layman which can actually be called harmful; for in common usage the term "safe" is not inapplicable to an article merely because the product may give rise to some effects which are uncomfortable or cause inconvenience.

Although this reading of the legislative history probably does not meet with the Government's whole-hearted approval, it can take solace in the fact that the Court does not feel that even an extensive history of past use of a drug without reported harmful results is enough to automatically put any possible ill-effect into the realm of the purely speculative. Congress never intended that the Government must be able to document a Thalidomide-type tragedy before it can obtain relief.[6]

■ In short, neither the absence from a record of reported past harm nor a mere showing of some possibility of future injury suffices by itself to allow a court to hold that a drug, not marked for sale only on prescription, is or is not misbranded.

The Government has called attention to medical literature [7] suggesting that it is often impossible, or at least impractical, for a physician to trace a particular consequence to a patient's preconsultation attempts at self-medication. On the basis of the supposed accuracy of this view, the Government argues in effect that a drug's theoretical potential for harm is all that need be shown in order to warrant a finding that it should be banned from the over-the-counter market. If this contention were valid, the Government's task in a case of this nature would be greatly simplified. However, the proper interpretation of the 1951 amendment does not support a "when in doubt, call it a prescription drug" principle. If anything,

5. While it seems that the Senate Committee's view of penicillin differed from that of Representative Wood, this case does not involve that particular drug; and the quotation from the Report and the excerpt from Mr. Wood's remarks are both included only to help in gleaning a general idea of the meaning of section 503 (b) (1) (B).

6. This is particularly evident from the fact that newly developed drugs are given special treatment in Federal Food, Drug and Cosmetic Act, § 505, as amended, 21 U.S.C. § 355. Section 503(b) (1) (C), 21 U.S.C. § 353(b) (1) (C), added by the 1951 amendment, operates in conjunction with section 505 to automatically place some new drugs in the "prescription only" category.

7. Sulzberger and Witten, Allergic Dermatoses Due to Drugs, 11 Postgraduate Medicine 549 (1952).

the Government's literature only serves to emphasize the effort and high quality of the preparation which is necessary on its part before presenting a case for decision.

█ Without presuming to list all the factors which may merit consideration in a section 503(b) (1) (B) action, the following seem especially pertinent here. Probably the single most important element is the seriousness of the effect likely to result under the Government's theory from unsupervised lay use of Decholin. The Government's answers to interrogatories state that the possible aftermath of self-medication by a person suffering from a tract obstruction is jaundice or even death. If it can prove its contention in this regard, no one could maintain that the harm attributable to the drug is not serious. However, in order that the product's true danger can be understood—in order that its theoretical and practical potentials for causing injury can be more clearly distinguished—it would be necessary to know in much more detail the circumstances under which jaundice or death will follow the ingestion of Decholin. For instance, it would be at least helpful, if not actually essential, to understand whether a normal dosage or only a quantity which the reasonable layman is likely to realize constitutes an excessive amount of self-medication will produce these effects. Similarly, a decision would be easier to reach if the record indicated the immediacy of the harmful consequences. Will jaundice or worse result only if a person suffering from an obstruction prolongs his reliance upon Decholin past the point at which the typical individual in his condition would have become convinced of the futility of self-help and have sought professional diagnosis and treatment? If this is the case, what effect would the drug have on the average man? During the period in which he could be expected to take the tablets, would Decholin result in a worsening of his condition to any significant extent beyond the point to which it would have progressed during the time from the onset of the indications until he would probably have consulted a physician had the drug not been available without prescription? If so, would this deterioration actually represent a more serious threat to his life or simply require additional treatment? It would also seem significant if the effects allegedly produced by Decholin cause a noticeable change in a victim's condition with the result that he could be expected to appreciate that the drug is doing him no good and discontinue its use before real harm occurs.

### Collateral Measures Question

In support of its position that it should be granted summary judgment on the basis of this issue regardless of the outcome of the toxicity question, the Government relies upon the fact that both it and Ames agree that the Decholin indications may be caused by a disease or a disorder (e. g., biliary tract obstruction) which the drug cannot cure. The Government argues that a person suffering from such an obstruction, for instance, is likely to go to the pharmacy, compare his symptoms with the Decholin label, purchase the drug, medicate himself and thereby postpone visiting a physician. Therefore, according to the Government, Decholin is unsafe as a matter of law because the layman is unable to detect the true cause of his discomfort when a differential diagnosis is essential to his well-being, and because his easy access to Decholin is responsible for delaying recourse to the expert qualified to make this all-important determination.

On the other hand, Ames contends that the Government is really saying nothing more than that, in the presence of some types of illness, Decholin is not an efficacious drug and that because of this lack of effectiveness, it should be treated as a prescription drug. This, continues claimant's reasoning, is clearly not a good argument because the action of the House in deleting from the Committee-sponsored bill before it the reference to efficacy as a test of an over-the-counter drug shows that Congress had no intention of having courts consider whether an article is effective or lives up to the

claims made for it when they are ruling in cases of this kind.

 Claimant oversimplifies the Government's position, and both parties improperly treat the question in too abstract a fashion. While Ames is probably correct in saying that the distribution of a drug was not intended by Congress to be restricted just because it will not serve as a cure in all instances in which it may be taken by a person following the manufacturer's recommendations, the fact that a particular product may be an ineffectual remedy under some circumstances could certainly be a substantial consideration in finding that it is unsafe for self-medication. Conversely, a showing that a drug has a tendency to cause laymen to delay seeking help in determining the natures of their illnesses is not *per se* sufficient to warrant removing it from the over-the-counter market.

Both of these observations find support in the legislative history surrounding the 1951 amendment. Justification for the former lies largely, as claimant suggests, in the fact that the House struck all mention of efficacy from the last draft of the bill.[8] However, it appears that the Senate Committee which studied this final version did not view the deletion as an indication that a court should not treat ineffectiveness as a factor where it could have relevance in determining a drug's safety. See S.Rep.No.946, 82d Cong., 1st Sess. 4 (1951). The latter opinion is bolstered by the House debates previously discussed in which it became apparent that no Representative wished to prevent the free sale of common household remedies. Nevertheless, any of these articles—aspirin, seltzers and mouthwashes—have certainly been taken on countless occasions by people suffering from ailments which these products could not cure when the users' best interests would have been served by professional consultation in lieu of self-medication.[9] Furthermore, it is worth noting that the draft bill recommended by the House Committee contained a proposal for the Federal Security Administrator to make a binding determination concerning which drugs were not safe for self-medication, subject only to limited judicial review.[10] The House deleted this authorization from the version that finally passed, and the record of the debate before this change was made indicates that the primary reason for its action was the fact that some lawmakers felt that the Administrator would see the provision as his mandate for placing an excessive number of medicines, traditionally considered harmless, into the "prescription only" category. 97 Cong.Rec. 9538–9, 9548. If the Court accepted the rule urged by the Government, it would to a great extent be undoing Congress' precautions. If merely establishing that the easy availability of a medicine has the tendency to postpone a differential diagnosis in a case in which the drug alone cannot provide a cure were enough to compel the removal of the product from a druggist's public shelves, there would be few drugs left on the over-the-counter market once the Government saw fit to

---

8. The pertinent language proposed by the House Committee on Interstate and Foreign Commerce is set out in note 4 supra. With the exception that a reference to a drug's efficacy and another to the Federal Security Administrator have been deleted, the wording of the Committee proposal is virtually identical to that now contained in section 503(b) (1) (B).

Among the common household remedies mentioned during the House debate as being over-the-counter drugs were Hadacol and Lydia Pinkham's pink pills. 97 Cong.Rec. 9537. Although these two products are considered "cure-alls," they have little potential for curing anything.

9. During oral argument on these motions, Government counsel was asked whether its view would not serve to make aspirin a prescription drug. His equivocal reply tended toward the negative, apparently because of his belief that Decholin, unlike aspirin, has the potential for being taken by a person who has a serious ailment that the drug cannot cure. This attempted distinction overlooks the fact that at the root of a headache may lie anything from nervous tension to a malignant brain tumor.

10. See note 4 supra.

wage a full-scale assault on self-medication.

Assuming, therefore, that efficacy is not totally unrelated to the question of safety but that the simple fact that inefficacy will result in a postponement in seeking professional assistance is not sufficient to warrant a finding that a product is a prescription drug, the question remains regarding the circumstances in which ineffectiveness, coupled with the likelihood of delay, would serve as the basis for considering a remedy dangerous for unsupervised lay use. The first factor would be the seriousness of the effect that a delay might cause, with the Government's case becoming stronger as its proof tends to show that the consequences of a postponed diagnosis do not merely border on inconvenience as opposed to actual harm. It also seems essential to know how much of a delay will be detrimental, for, in light of the legislative history, it is improper to view the 1951 enactment as a measure designed to protect the stubborn individual who continues to put his trust in self-medication long after the average person would have sought out a physician.

■ A third concern would certainly be the quality of the advice, invariably contained on a drug label, cautioning users to consult a practitioner if certain symptoms develop in addition to those for which the medicine has been recommended by its manufacturer. The Congressional debates suggest that this factor is important. Representative Wolverton's remarks included this question and answer:

"Thirty-fourth question: Does the bill restrict the public's choice of remedies?

"Answer: No. It guarantees that all drugs that can be safely used by a layman shall be labeled with complete directions which the purchaser can follow without medical advice. It does prevent the sale without prescription of drugs that would harm the purchaser if he took them without professional advice. It is distinctly advantageous to the public." 97 Cong.Rec. 9532.[11]

The Government in this case has raised the point that a layman cannot determine whether he is suffering from a disorder such as a tract obstruction or a disease like jaundice, although he can compare his symptoms with the indications mentioned on the Decholin label. However, it appears in light of the above excerpt that the pertinent question is not whether an individual is able to detect the cause of his ailment, but rather whether the symptoms described on the package as reasons for him to visit a physician are sufficient to alert him to the possibility that his illness may require professional attention. In other words, if a serious disease which Decholin cannot cure is the crux of the trouble, will nausea or severe abdominal pain appear along with excessive belching and constipation?

■ A fourth consideration is closely related to the third because an over-the-counter drug will probably carry, as Decholin does, a warning on its container to the effect that if the indications continue, a physician should be consulted. The issue is whether in a case where a particular drug will not alleviate the cause of an ailment it will, nevertheless, effect a disappearance of the indicative symptoms with the result that a user may have every reason to feel that he has been cured when, in fact, he has not been.[12]

11. Apparently the sufficient directions provision referred to by Representative Wolverton is that which was already contained in the Federal Food, Drug and Cosmetic Act, § 502(f), 21 U.S.C. § 352 (f).

12. During House Committee hearings on the proposed amendment, George P. Larrick, Associate Commissioner of Food and Drugs, used the drug aminophylline as an example of this point. He commented: "It is not a poison. It is an effective diuretic and will reduce swelling of the ankles other than that caused by insect bites and the like. A layman cannot effectively treat himself with the diuretic because the underlying cause of the swelling is heart or kidney disease and the use of the diuretic to control the symptoms does not affect the progress of the underlying cause.

484

In the present record, there is a dispute between Dr. Sklar and all the other experts whose affidavits touched upon this question.

Finally, the previous discussion of Congressional meaning behind the word "safe" and the necessity for distinguishing between the practical and the theoretical in order to do justice to Congressional intent is, of course, as applicable in the context of the collateral measures question as it is in connection with the toxicity issue.

### Conclusion

As the foregoing discussion indicates, there are not only differences of opinion in the record concerning pertinent factual issues, but also an absence from the record at this time of evidence relating to many of the factors which must be considered before the outcome of this case can be decided. For these reasons, both motions for summary judgment are denied. An appropriate order shall be submitted.

Thus, the ill-advised use of the diuretic may indirectly hasten the death of the patient."

Hearings Before the House Committee on Interstate and Foreign Commerce on H.R. 3298, 82d Cong., 1st Sess. 94 (1951).