The UNITED STATES of America

v.

GENERAL NUTRITION, INCORPORATED, Gary A. Daum, David E. Walsh, George E. McTurk, Ilene M. Fenicchia and Jessie M. Copia.

No. CR–84–174E.

United States District Court, W.D. New York.

May 27, 1986.

Joseph M. Guerra, III, Asst. U.S. Atty., Buffalo, N.Y., Anita Johnson, Washington, D.C., and Donald E. Segal, Rockville, Md. for plaintiff.

Joseph V. Sedita, Michael Brady, Buffalo, N.Y., Robert B. Fiske, Jr., Pamela R. Chepiga, Charles A. Stillman, New York City, Joseph Sbarbati, Niagara Falls, N.Y., Peter Fleming, Jr., Milton Bass, New York City, for defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

The abovenamed corporation and individuals ("the defendants") are charged in a seven-count Indictment with violations of the Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 301 *et seq.* in connection with the marketing of a substance known as "Gammaprim", and with conspiracy to defraud the government in violation of 18 U.S.C. § 371. Presently pending are motions to dismiss the Indictment by all of the defendants on a number of grounds as well as specific motions to dismiss by defendants Fenicchia and Copia.

The heart of the matter is the legal tenability of any distinction between "food" and "drug" on the one hand and between "over the counter" and "prescription" drugs on the other, within the terms of the Act. General Nutrition, Incorporated ("GNI") is a corporation "engaged in the production, distribution and sale of nutritional, personal care and related products." Defendants' Summary Memorandum, pp. 2–3. The oth-

er defendants are officers and employees of GNI. GNI markets Gammaprim, a substance derived in part from oil of evening primrose. The Indictment charges *inter alia* that Gammaprim was touted as effective in prevention, mitigation and treatment of certain medical conditions such as hypertension, arthritis and multiple sclerosis by virtue of which it is a drug within the meaning of 21 U.S.C. § 321(g).[1] Specifically, Count I of the Indictment alleges conspiracy by GNI, Daum, Walsh and McTurk to defraud the United States in violation of 18 U.S.C. § 371 by participating in the offenses alleged in the remaining counts. Counts II–VII allege identical statutory violations but in different factual settings. GNI, Daum, Walsh and McTurk are named as indictees in all counts. Fenicchia is named as such in Counts II and VII while Copia is so named in Count V. The counts allege that Gammaprim, a drug within the meaning of section 321(g) was "misbranded"—a prohibited act within the meaning of 21 U.S.C. § 331(k) and one for which a penalty is provided by section 333(a). This misbranding took three different forms according to the Indictment. First, it is alleged that the Gammaprim label violates 21 U.S.C. § 352(f)(1) which provides that a drug shall be deemed misbranded unless its labeling bears adequate directions for use. Second, a violation is alleged of 21 U.S.C. § 353(b)(1)(B) which provides that a drug which,

> "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use

except under the supervision of a practitioner licensed by law to administer such drug,"

must be dispensed by prescription or it will be deemed misbranded. Third, the defendants are said to have violated 21 U.S.C. § 353(b)(4) which provides that drugs coming within section 353(b)(1) will be considered misbranded if they do not bear the statement "Caution; Federal law prohibits dispensing without a prescription." The defendants' main arguments in favor of dismissing the Indictment are that Gammaprim is improperly classified as a prescription drug—to wit, that it is a food, or at most an over the counter drug—, that the government's failure to adhere to a uniform definition of proscribed conduct under the Act implicates the defendants' due process rights and that, in any event, this prosecution infringes the defendants' First Amendment rights to express opinions regarding Gammaprim's alleged nutritional value.

The Gammaprim label consists, insofar as is pertinent here, of a listing of contents and the directions "As a food supplement, take up to six capsules per day." The Indictment charges that Gammaprim was promoted in the media and elsewhere for its supposed beneficial health effects. For example, it is alleged that Gammaprim was sold in conjunction with certain "self-help" literature purporting to provide a medical and scientific context to the uses of the substance.[2] Brochures that are part of its integrated distribution program can be found to constitute a drug's labeling. *United States v. Guardian Chemical Cor-*

---

**1.** Drugs, as defined by 21 U.S.C. § 321(g)(1)(B), include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man". "Food," in comparison, is defined under 21 U.S.C. § 321(f) as: "(1) articles used for food or drink * * * (2) chewing gum, and (3) articles used for components of any such article." What is immediately apparent from a plain reading of this statutory language is that "food" is given its common sense, every day usage (with the specifically enumerated exception of chewing gum) and that something that is a food might also be a drug according to the definitions. (For example, orange juice can be said to be used to prevent disease. *See, e.g. American Health Products Co., Inc. v. Hayes*, 574

F.Supp. 1498 (S.D.N.Y.1983), *aff'd*, 744 F.2d 912 (2d Cir.1984)).

**2.** The first "overt act" listed by the government in support of its conspiracy charge in Count I reads as follows:

> "On or about May 9, 1980, David F. Horrobin wrote a letter to defendant DAVID E. WALSH, proposing the test marketing of Efamol primrose oil 'without FDA approval', and referring to the effects of Efamol on blood pressure, arthritis and alcoholism, among other conditions and diseases; stating, 'Obviously you could not advertise Efamol for these purposes but equally obviously there are ways of getting the information across.'"

*poration,* 410 F.2d 157 (2d Cir.1969). Thus Gammaprim is said to be a drug within the meaning of 21 U.S.C. § 321(g)(1)(B). Moreover, the government asserts that Gammaprim is a prescription drug under 21 U.S.C. § 353(b)(1)(B) because collateral measures are necessary to its use. Thus the government suggests:

> "Collateral measures necessary to the safe use of Gammaprim in the management of hypertension means all those things which a layman, because of his or her lack of education, training, and experience, cannot do to safely manage the disease. These include taking a proper history, doing a physical exam, ordering appropriate laboratory tests, having a knowledge of the diseases that cause hypertension, integrating the results of the history, exam, and tests with this knowledge, making a diagnosis, designing a treatment plan, and carrying the plan through with proper continuing evaluation." Government's December 20, 1985 Memorandum in Opposition to Motion to Dismiss All Counts Based Upon the Prescription Drug Status of Oil of Evening Primrose at p. 5.

The defendants argue that this definition of collateral measures improperly focuses on "disease" rather than the nature of the alleged drug itself. The government, they add, has not pointed out any harmful characteristic of Gammaprim *per se.* Any number of over the counter drugs are "labeled and marketed for diseases commonly considered to require physician diagnosis and management." Memorandum in Support of Defendants' Motion to Dismiss All Counts Based upon the Prescription Drug Status of Oil of Evening Primrose, p. 13. The defendants assert that the government's approach to "collateral measures" is so expansive that it would encompass commonly used substances, both food and drug, that might arguably require physician supervision in relation to certain diseases.[3] They cite *United States v. Article Of Drug Labeled Decholin,* 264 F.Supp.

473 (E.D.Mich.1967), wherein a "theoretical potential for harm" was not accepted as a basis or reason for assigning a product to the category of a prescriptive drug. *Id.* at 480.

The government argues, tenably, that the inherent characteristics of a drug are targeted by those facets of 21 U.S.C. § 353(b)(1)(B) which cover drugs possessing "toxicity or other potentiality for harmful effect." The defendants' assertion of redundancy for the "collateral measures necessary to its use" language would effectively read it out of the statute.

■ The simplest answer to the defendants' arguments here, and to some extent elsewhere, is that the statute *is* intended to be broad. As the government asserts, subsection (B) is a catchall provision designed to cover drugs which merit prescription-status scrutiny, but do not fit within the more precise specifications of the subsection. Safety legislation must be liberally construed to effectuate the congressional purpose. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980). The Supreme Court elsewhere has stated:

> "The purposes [of the Food, Drug and Cosmetic Act] thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

The holding in *United States v. Article of Drug Labeled Decholin, supra,* is not as inflexible as the defendants would have it. Therein it was noted:

> "While [the intervenor-claimant] is probably correct in saying that the distribution of a drug was not intended by Congress

---

**3.** *E.g.,* insulin, aspirin, Lonalac, Mallox, Primatene, etc. *See* Memorandum in Support of Defendants' Motion to Dismiss All Counts Based

upon the Prescription Drug Status of Oil of Evening Primrose, *supra,* pp. 13–16.

to be restricted just because it will not serve as a cure in all instances in which it may be taken by a person following the manufacturer's recommendations, the fact that a particular product may be an ineffectual remedy under some circumstances could certainly be a substantial consideration in finding that it is unsafe for self-medication. Conversely, a showing that a drug has a tendency to cause laymen to delay seeking help in determining the natures of their illnesses is not *per se* sufficient to warrant removing it from the over-the-counter market." *Id.* at 482.

That court, after an analysis of the underlying legislative history, thus proceeded to set forth certain factors bearing on the question of the point where the balance shifts from over-the-counter to prescription drug status. Major considerations, in its view, would be the extent of information and warning carried on a given label. *See, id.* at 483.[4] Significantly for present purposes, Gammaprim did not carry any warning or advice concerning consultation of a physician or symptomology. Also significantly, the various drugs listed by the defendants—*see* note 3, *supra*—concededly contained some degree of medical instruction or caution on their labels. Thus assuming Gammaprim is classified as a drug, any potential dangerous effects will be magnified by the complete absence of medical and cautionary information to the consumer. This absence of information is clearly not contemplated by the Act and it is disingenuous to suggest otherwise or that the defendants would not possess the threshold degree of sophistication to understand that. The United States Supreme

Court has held that a criminal statute must be sufficiently definite so as to give notice of proscribed conduct. However,

"no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952).[5]

More troublesome is the threshold question when does a food become a drug for purposes of the Act. The defendants have cast this phase of the inquiry in due process terms although analytically the focus remains on the nature of the substance in general and its place in the regulatory system set up under the Act. Thus the issue in some respects merges with the previous analysis of prescription drug status.

The defendants contend they have not been treated fairly or evenhandedly because non-prescription products on the market have been permitted (indeed supposedly encouraged) by the government to make health claims comparable to those made for Gammaprim. The government in construing this argument as a selective prosecution defense misses a narrow but significant distinction. The argument focuses on conduct, not on parties as in selective prosecution. What is claimed is not a universal rule occasionally invoked but the lack of any constant rule. With no consistent standard to guide them and, indeed, with certain approbative government conduct in comparable circumstances, the defendants urge they cannot fairly be held accountable

---

4. Thus the court cited Representative Wolverton's comment that the Act

" 'guarantees that all drugs that can be safely used by a layman shall be labeled with complete directions which the purchaser can follow without medical advice. It does prevent the sale without prescription of drugs that would harm the purchaser if he took them without professional advice. * * *' 97 Cong.Rec. 9532." *Id.* at 483.

For similar language concerning need for judicial interpretation of the Act consistent with its purpose to protect public health, *see* S.Rep. No.

946, 82d Cong. 1st Sess. 4 (1951), U.S.Code Cong. & Admin.News 1951, p. 2454, as set forth in *United States v. Article of Drug Labeled Decholin, supra,* at 479–480.

5. The government points out that subsection 353(b)(1)(B) has previously been upheld against constitutional challenges for vagueness. *See United States v. Forester,* 346 F.2d 685 (4th Cir. 1965); *United States v. 2600 State Drugs,* 235 F.2d 913 (7th Cir.), *cert. denied,* 352 U.S. 848, 77 S.Ct. 68, 1 L.Ed.2d 59 (1956).

for their actions. This argument also misses the point.

The defendants have brought forth some documentation concerning their contention (1) that a number of commonly known products allowed to be sold over-the-counter make health claims comparable to those made for Gammaprim and (2) that government officials have encouraged the making of such claims as to certain products. The government objects that the defendants' submissions in this context have limited probative value. The defendants urge an evidentiary hearing to amplify the record. However, there is no need to delve factually any further. The defendants' anecdotal approach merely diverts attention from what should be the primary focus at this juncture—the terms of the statute.

■ Although the Act establishes a somewhat complex network, its broad purpose—the protection of the public—is clear. In this vein, procedures have been established allowing evaluation of new drugs, or arguably new drugs, entering the marketplace. *See e.g.* 21 U.S.C. § 355. These new drug provisions must be construed broadly to meet the Congressional purpose "to keep inadequately tested medical and related products which might cause widespread danger to human life out of interstate commerce." *AMP Incorporated v. Gardner,* 389 F.2d 825, 829 (2d Cir.), *cert. denied,* 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968); *cf., United States v. Generix Drug Corp.,* 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983) (broad interpretation to be given new drug provision). A new drug is, *inter alia,* one that is not recognized by experts as safe and effective. The initial forum for such determination in cases of doubt—i.e., where there is no apparent recognition by the "experts"—is the agency. The nature of agency review and the avenues of review available (such are indeed available) needn't be recited beyond acknowledgement.[6] The defendants attempt to shift the primary inquiry away from the statute, which provides a fair and comprehensible system by which close questions can be resolved, and to various examples of feasance and nonfeasance by the agency which may or may not be at odds with the statutory terms. If there was significant question about the underlying terms of the statute, the defendants' argument might carry more weight. There is not. The fact that the defendants may challenge certain applications of the Act in other instances does not justify overlooking the legitimate process by which such challenge can be resolved, or otherwise ignoring the Act's strictures. It is conceivable, for example, that adherence to the appropriate statutory processes might result in a conclusion that Gammaprim is safe and effective and should be marketed over the counter (with proper labeling). The point is not that Gammaprim is necessarily bad but that the defendants, allegedly, have evaded statutory obligations with a resultant potential for harm.

■ The defendants cite *United States v. Diapulse Corp. Of America* ("*Diapulse*"), 748 F.2d 56 (2d Cir.1984), wherein it is stated at page 62 that

"we must insist that the FDA apply its scientific conclusions evenhandedly * *. * * * Deference to administrative discretion or expertise is not a license to a regulatory agency to treat like cases differently."

However and putting aside certain significant procedural differences between *Diapulse* and the case at hand, in *Diapulse* the agency had the opportunity to develop a factual and scientific record, something lacking here. Thus product comparisons could be competently made. Moreover the appellate court's holding was a narrow one. The products under comparison were found to be essentially identical. One was permitted to be marketed and the other was not. Given the precise circumstances, the Court held, the FDA was obliged to act

6. The question is explored in some detail in *Premo Pharmaceutical Laboratories, Inc. v. Unit-* *ed States,* 629 F.2d 795, 801–804 (2d Cir.1980).

consistently.[7] Such is not the situation here. Although this Court has certain concurrent jurisdiction with the agency on the question of new drug applications (which has not been invoked here)—*see Premo Pharmaceutical Laboratories, Inc. v. United States, supra,* at fn. 6—, the defendants' indirect attempt to invoke such or related jurisdiction through the device of an evidentiary hearing after the fact of prosecution when the problems sought to be resolved initially could and should have been handled in the preferred forum—the agency—tends to eviscerate the new drug framework of the statute. By not availing themselves of procedures by which they properly could have made their arguments, the defendants "deliberately" have gone "perilously close to an area of proscribed conduct," have taken "the risk" of crossing the line, and shall not now be heard to complain of unfairness of the result. *Boyce Motor Lines v. United States, supra.*

■ The defendants also urge dismissal on First Amendment grounds. The question, as they frame it, is

"whether the dissemination of truthful information as to a food product's nutritional value is subject to the elaborate and exacting regulatory requirements for drugs—much less criminal prosecution—because that information may give rise to therapeutic statements." Memorandum of Law in Support of Defendants' Motion to Dismiss the Indictment as a Violation of Their First Amendment Rights, pp. 1–2.

The simple answer is that in this instance it is not speech *per se* which invokes prosecution (or which thereby is "chilled") but rather certain speech in a certain limited context. Just as a constitutionally acceptable prohibition against shouting, falsely, "Fire!" in a crowded room is in no sense a prohibition against all inane or irresponsible utterances, so in this case the govern-

ment does not challenge the defendants' right to expound on the possible virtues of Gammaprim. It merely contends that in certain circumstances such commentary may become part of the labeling of the product and serve, in a sense, as evidence of a violation of the Act. It is the product and the manner in which the product is marketed which is said to be illegal. To the extent that the "speech" concerning the product is independent of its marketing, this Court is unaware of any effort, desire or right of the government to challenge it. That certain ancillary information may in limited circumstances constitute labeling has already been noted. *United States v. Guardian Chemical Corporation, supra.* It has been held that "[e]ven in the absence of a finding of actual deception, agencies may properly regulate speech that is merely potentially deceptive." *Bristol-Myers Co. v. F.T.C.,* 738 F.2d 554, 562 (2d Cir. 1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 960, 83 L.Ed.2d 966 (1985). The substantial government interest in the goals of the Act justify this extremely narrow encroachment on what is, insofar as it is construed as labeling, clearly commercial speech. See *Zauderer v. Office of Disciplinary Counsel,* — U.S. —, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

■ The defendants seek dismissal of the conspiracy charge in Count I, arguing there is no allegation of misrepresentation or chicane and relying for that proposition on *Hammerschmidt v. U.S.,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924), and *United States v. Klein,* 247 F.2d 908 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). As the government points out, however, it is sufficient to sustain a charge under 18 U.S.C. § 371 to allege the forming of a conspiratorial agreement with specific intent to defraud the United States. *See United States v. Tarnopol,* 561 F.2d 466, 474 (3d Cir.1977). *See also United States v. Turkish,* 623 F.2d 769, 771 (2d Cir.1980), *cert.*

---

7. Indeed the United States Court of Appeals for the Second Circuit appeared surprised at the leniency of the FDA. "So long as the FDA allows UME [Diapulse Corp.'s competitor] to circumvent its rejection of athermal electric ef-

fects" and holds to "its curious policy of permitting a device to say it performs one function in order to be sold solely to do another," Diapulse Corp. would be permitted to market its machine in similar fashion. *Ibid.*

*denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). *Hammerschmidt v. United States, supra*, 265 U.S. at 188, 44 S.Ct. at 512 merely states that to defraud the United States "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." There is no question but that Count I is sufficient in this regard. The defendants' further arguments go more to the sufficiency of any proof and matters for trial than to legal issues and need not be addressed.

■■■ The defendants contend Count I must be dismissed as duplicitous because it charges both a conspiracy to defraud the Food and Drug Administration (a felony) and a conspiracy to violate the Act (a misdemeanor). However it is clear that a conspiracy with more than one object may be charged. *United States v. Williams*, 705 F.2d 603, 624 (2d Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983). The defendants' assertion that the government has conceded the existence of two distinct conspiracies is unfounded. Finally, the determination whether felony or misdemeanor punishment should be imposed for a conviction on Count I can be based upon a special verdict. *United States v. Orozco-Prada*, 732 F.2d 1076, 1083 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984).

■■■ Also, the remaining counts are not duplicitous. Each charges misbranding in violation of 21 U.S.C. § 331(k). The violations of sections 352(f), 353(b)(1) and 353(b)(4) alleged in each count are merely specifications of the ways in which the primary offense was committed.

Fenicchia has moved to dismiss the two counts against her on four grounds: (1) imposition of strict liability against her is not warranted by the statute involved; (2) the Act, as applied to her, is void for vagueness; (3) the counts, taken together with the government's Bill of Particulars, fail to state a crime; and (4) the charges violate her First Amendment rights. Copia has moved to dismiss the count in which she is charged as void for vagueness as applied,

for failure to state a crime, as infringing on her First Amendment rights, and as multiplicative.

The defendants' general challenge to the Indictment on First Amendment grounds has previously been discussed. Fenicchia and Copia have not set forth any arguments which would produce a different result as to them. Similarly Copia's motion to dismiss the charges against her as multiplicative fails for the same reason as did the defendants' duplicity challenge.

■■■ Fenicchia and Copia's other arguments warrant some additional consideration, however. Fenicchia is described as a manager and store clerk at a GNI retail outlet. Copia is said to be a store clerk and assistant manager at another such GNI outlet. They are charged in connection with undercover purchases of Gammaprim at their respective outlets at which time, it is alleged, they made statements concerning the substance and otherwise connected it to the promotional material which constitutes a basis for the allegations of misbranding. Such defendants' motions focus on their relatively low position in the corporate hierarchy, the supposed non-commission by them of any criminal acts or, in the event such acts could be so construed, the unreasonableness of expecting anyone in their positions to understand the criminality of such acts, and the supposed vagueness of the underlying statute. Their respective positions do not excuse their alleged conduct. The Act provides that "[a]ny person" who violates section 331 shall be liable. 21 U.S.C. § 333(a). Although the government has cited a number of cases supporting prosecution under the Act of lower level corporate employees, it is unnecessary to go beyond the plain language of the statute. "Any" means any. The focus then must shift to the specific acts of such defendants. Their arguments that the counts against them fail to state a claim actually go to the sufficiency of the government's proof rather than to the legal basis of the Indictment. The government has set forth certain representations and actions by them which allegedly constituted misbranding. It asserts that they caused Gammaprim to be misbranded within the

meaning of section 352(f) by oral representations—*see United States v. Hohensee,* 243 F.2d 367, 370 (3d Cir.), *cert. denied,* 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136, *reh. denied,* 354 U.S. 927, 77 S.Ct. 1376, 1 L.Ed.2d 1441 (1957)—and by associating the product with literature written by third persons—*see United States v. Sene X Eleemosynary Corp., Inc.,* 479 F.Supp. 970 (S.D.Fla.1979). It is alleged that the defendants caused Gammaprim to be misbranded within the meaning of section 353(b)(1) because they played a role in its dispensation without a prescription. *See United States v. Key,* 371 F.2d 421, 423 (6th Cir.), *cert. denied,* 386 U.S. 982, 87 S.Ct. 1287, 18 L.Ed.2d 230 (1967); *Palmer v. United States,* 340 F.2d 48, 50 (5th Cir. 1964), *cert. denied,* 382 U.S. 903, 86 S.Ct. 238, 15 L.Ed.2d 156 (1965). Finally, the allegation under subsection 353(b)(4) flows from the allegation under subsection 353(b)(1). While the government's proof may not support these charges, they cannot be said to be without legal foundation.

Fenicchia and Copia assert that the Act is impermissibly vague and a trap for the unwary as it is sought to be applied to them. The vagueness, they argue, is exacerbated by the government's strict liability designation of the offenses. They assert that the constitutionality of the statutes as applied must be measured by juxtaposing

> "the fundamentally innocuous nature of the conduct alleged with the high degree of technical and legal mastery needed to discern the specific conduct required or forbidden by those same statutes."

Memorandum of Law In Support of Defendant Fenicchia's Motion to Dismiss, at p. 18.

They argue that examples of standard contamination, mislabeling, or tampering "at least provide fair warning so as to justify imposition of strict criminal liability." *Id.* at p. 22. The essence of the void for vagueness doctrine is that a statute must provide fair warning and clear definition of its prohibition. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972). However,

> "difficulty in determining whether certain marginal offenses are within the

meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. *United States v. Wurzbach,* 280 U.S. 396, 397 [50 S.Ct. 167, 168, 74 L.Ed. 508] (1930)." *Jordan v. DeGeorge,* 341 U.S. 223, 231, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951).

This Court has already noted that the Act has a broad but clearly discernible goal of protecting the public from potentially dangerous substances. That purpose has been repeatedly emphasized by courts in construing these statutory provisions. The Act on numerous occasions has been upheld against vagueness challenges—see e.g. *United States v. Forester, supra,* at fn. 5; *United States v. 2600 State Drugs, supra,* at fn. 5; *United States v. Sullivan,* 332 U.S. 689, 695, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948); *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 89, 91, 84 S.Ct. 559, 562, 563, 11 L.Ed.2d 536 (1964); *United States v. Hohensee, supra*—and this Court is unaware of any case holding any provision of the Act void for vagueness in any circumstance. The government points out that, after her first alleged violation, Fenicchia was sent a copy of a letter dated September 10, 1981 from the Food and Drug Administration which notified her of the asserted impropriety of her conduct. Moreover, the government sets forth certain policy guidelines addressed by GNI to its employees which assertedly warn against the kind of conduct with which these defendants are charged. None of this information, however, is essential to disposition of the present issue. Without belaboring points which have already been mentioned herein, this Court notes that the Act provides a clear, albeit complex, scheme designed to safeguard against the sale as medicine of products which may cause indirect harm by not living up to the promises made in connection therewith, or which may cause direct harm, or which are simply harmful *in potentia* because their effects have not been ascertained. This is a statute directed at common sense. It is difficult to see how "mislabeling" (labeling one substance as another), which Fenicchia

concedes is fairly warned against, is analytically different from misbranding. Also it is not unreasonable to expect one in the business of selling any products for human consumption to recognize that lack of knowledge and or lack of quality control has a potential for harm and may well be the subject of legislation or that products claiming significant health benefits and which have no historical or every day reputation as food might arguably be classified as medicine and subject to regulation. This Court is convinced that the Act provided these defendants with adequate notice of the criminality of the offenses charged. Accordingly, it is hereby

ORDERED that the defendants' motions to dismiss on various grounds are denied; and it is further hereby

ORDERED that the attorneys for the respective parties attend a session of this Court at Buffalo at 4:00 p.m. on Thursday, June 5, 1986 for the purpose of setting times for the selection of a trial jury and for the swearing of such body and opening statements and presentation of evidence.