512 F.2d 688
 The NATIONAL NUTRITIONAL FOODS ASSOCIATION and Solgar Co.,
Inc., Plaintiffs-Appellants,
v.
Casper W. WEINBERGER, Secretary of Health, Education and
Welfare and Alexander M. Schmidt, Commissioner of
Food and Drugs, Defendants-Appellees.
 No. 228, Docket 74-1738.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 30, 1974.
Decided Feb. 3, 1975.
 
 Milton A. Bass, New York City (Bass & Ullman, New York City, of counsel), for plaintiffs-appellants.
 Naomi Reice Buchwald, Asst. U.S. Atty. (Paul J. Curran, U.S. Atty., for the Southern District of New York, Gerald A. Rosenberg, Asst. U.S. Atty., New York City, of counsel), for defendants-appellees.
 Kirkpatrick W. Dilling, and Dennis M. Gronek, Chicago, Ill. (Diana J. Dilling, Chicago, Ill., of counsel), for amicus curiae National Health Federation.
 Before LUMBARD, WATERMAN and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 This appeal by producers and vendors of vitamin preparations arises out of their unsuccessful attempt in the Southern District of New York to challenge regulations promulgated by the United States Food and Drug Administration ("FDA" herein) pursuant to § 701(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "Act" herein), which classify as "prescription drugs" all preparations of Vitamin A containing more than 10,000 IU (international units) per dosage form and of Vitamin D containing more than 400 IU per dosage form.[1] In the district court appellants sought declaratory and injunctive relief against the regulations, claiming that the FDA has no power to issue binding regulations under § 701(a), that the vitamin preparations at issue are foods and were improperly classified as prescription drugs under the Act, that plaintiffs were entitled to a de novo trial in the district court of factual issues going to the basis of the regulations and the FDA's action in promulgating them was unsupported by substantial evidence. Appellants further contended that the "whole record" of the agency's action was not before the district court, and sought to depose the Commissioner of Food and Drugs ("Commissioner" herein). The district court, Marvin E. Frankel, Judge, vacated the notice of deposition and granted summary judgment dismissing the complaint.
 
 
 2
 Purporting to act under the general rule-making power vested in the Secretary of Health, Education and Welfare ("HEW" herein) by § 701(a) of the Act, 21 U.S.C. § 371(a), which authorizes him "to promulgate regulations for the efficient enforcement of this Act," the Commissioner, to whom this rule-making authority is delegated, 21 C.F.R. 2.120(a)(1), followed the notice-and-comment procedure outlined by § 4(c) of the Administrative Procedure Act,[2] 5 U.S.C. § 553(c), in promulgating the challenged regulations. First he published a statement in the Federal Register, 37 Fed.Reg. 26618, on December 14, 1972, giving notice of his proposal to adopt regulations which would require that, pursuant to the "prescription drug" law, § 503(b)(1) of the Act, 21 U.S.C. § 353(b),[3] Vitamins A and D in dosage units in excess of 10,000 IU and 400 IU, respectively ("higher dosage forms" herein) be restricted to prescription sale and deemed misbranded unless the label of the container in which they were sold or dispensed bore appropriate disclosure and warnings.
 
 
 3
 The Commissioner's initial statement advised that, according to medical literature, the ingestion of large dosages of Vitamins A and D over long periods could have serious toxic effects and that these vitamins were available over the counter in dosage forms many times the daily allowance recommended and published by the Food and Nutrition Board of the National Academy of Sciences-National Research Council ("NAS/NRC" herein). According to the Commissioner's statement the excess dosage forms were the subject of widespread promotion to the public for prophylaxis and treatment of a variety of diseases and disorders. The American Academy of Pediatrics had published a statement warning physicians regarding the various forms of toxicity that could result from intake of the large amounts of Vitamin A being recommended by vendors to the public in the press, on radio and on TV. Many types of serious adverse effects from ingestion of excessive amounts of Vitamins A and D were listed, including some that resulted in death. The recommended daily allowance ("RDA" herein) published by the Food and Nutrition Board of the NAS/NRC as between 4,500 and 5,000 IU of Vitamin A for older children and adults, 6,000 IU during pregnancy and 8,000 IU during lactation. For Vitamin D preparations the RDA was 400 IU for all age groups. The Commissioner placed on public view an extensive bibliography of the medical literature employed by the FDA in formulating its proposed regulations. The Commissioner's statement invited interested persons to file with the HEW within 60 days any written comments they might desire to submit with respect to the proposals, together with memoranda and briefs, all of which would be available for public inspection.
 
 
 4
 Over, 2,500 written comments were submitted by a wide cross-section of the public, including consumers, physicians, nurses, pharmacists, pharmaceutical manufacturers, health food store operators. Various organized consumer and other groups, including the Academy of Pediatrics, American Medical Association, and the Pharmaceutical Manufacturers Association also responded. Both plaintiffs in this case submitted extensive comments opposing the regulations. According to the Commissioner; the comments fell into three general categories: (1) Those who viewed the proposed regulations as suitable. This group included the American Medical Association, the American Academy of Pediatrics, various consumer groups, physicians and others; (2) Those who agreed that vitamins could be toxic, but at higher levels that those proposed by the Commissioner. In this group were the majority of the drug manufacturers and trade associations plus some consumers; and (3) Those who disagreed with the proposals entirely, taking the view that such vitamin preparations are food and that consumption of desired quantities is an individual right. These comments came mostly from consumers and health food establishments.
 
 
 5
 In a report published in the Federal Register on August 2, 1973, 38 Fed.Reg. 20723, the Commissioner summarized the comments received by the FDA, concluded that the proposed regulations were in the public interest, and ordered that they become effective on October 1, 1973. In response to contentions that Vitamins A and D were foods rather than drugs, and thus not subject to regulation as "prescription drugs," the Commissioner referred to orders which he had published on January 19, 1973, promulgating as regulations §§ 80.1, 125.1 and 125.3 (21 C.F.R. §§ 80.1, 125.1 and 125.3).[4] He concluded that vitamins in daily amounts between the upper and lower limits specified in § 80.1 (i. e., 1,250 to 8,000 IU of Vitamin A and 200 to 400 IU of Vitamin D) were adequate for all nutritional needs of normal individuals and that nutrients at these levels could be considered as dietary supplements or foods for special dietary use. With respect to the higher level dosages, which were to be dispensed only upon prescription, however, he stated:
 
 
 6
 TABLE CONTINUED
-------------------------------------------------------------------------------
Adults and children 4
or more years of age-- Pregnant or lactating
U.S. RDA women--U.S. RDA
---------------------- ---------------------
 Lower Upper Lower Upper
 Limit Limit Limit Limit
-------------------------------------------------------------------------------
 2,500 5,000 5,000 5,000 8,000 8,000
 ----- ----- ----- 400 400 400
 15 30 45 30 30 60
 30 60 90 60 60 120
 0.2 0.4 0.4 0.4 0.8 0.8
 0.75 1.50 2.25 1.50 1.70 3.00
 0.8 1.7 2.6 1.7 2.0 3.4
 10.0 20.0 30.0 20.0 20.0 40.0
 1.00 2.00 3.00 2.00 2.50 4.00
 4.5 3.0 6.0 9.0 8.0 12.0
 200 400 400 ----- ----- -----
 0.150 0.300 0.450 0.300 0.300 0.600
 5.0 10.0 15.0 10.0 10.0 20.0
 0.125 1.000 1.500 0.125 1.300 2.000
 0.125 1.000 1.500 ----- ----- -----
 75 150 225 150 150 300
 9 18 27 18 18 60
 100 400 600 100 450 800
 ----- ----- ----- 0.125 1.300 2.000
 1.0 2.0 3.0 1.0 2.0 4.0
 7.5 15.0 22.5 7.5 15.0 30.0
1 When labeled for use by infants, a dietary supplement shall contain not
 less than the lower limit designated for a nutrient in this column nor more
 than 100% of the infant U.S. RDA for a nutrient as prescribed in Sec.125.1(b)
 except that the level of biotin, when used, shall be 0.05 mg per daily
 recommennded quantity.
2 Optional for adults and children 4 or more years of age.
3 Optional for liquid products.
4 Lower limit may be 0.05 milligram until December 31, 1976.
5 Optional for pregnant or lactating women. When present, the quantity of
 phosphorrus may be no greater than the quantity of calcium.
 
 
 7
 "No evidence was submitted in the comments to establish a food or nutritional use of vitamin A or vitamin D at higher levels, except for a limited number of persons with poor vitamin D absorption who need up to 1000 IU of this vitamin for nutritional purposes under medical supervision. With that one exception, which is recognized in the revised regulation, intake of vitamins at levels exceeding the upper limits as specified in § 80.1 are therefore appropriate only for therapeutic purposes and thus are properly classed as drugs."
 
 
 8
 On August 6, 1973, plaintiffs brought suit in the Southern District of New York seeking declaratory and injunctive relief that would prevent enforcement of the proposed regulations. In September 1973 Judge Frankel denied a motion for preliminary injunctive relief in an opinion at 366 F.Supp. 1341, (S.D.N.Y.1973), which we affirmed, 491 F.2d 845 (2d Cir. 1973). On October 1, 1973, the regulations went into effect. In a further opinion dated April 5, 1974, published at 376 F.Supp. 142 (S.D.N.Y.1974), Judge Frankel granted defendant's motion for summary judgment dismissing the complaint and upheld the regulations as having been promulgated pursuant to the Commissioner's authority under the Act. He further held that plaintiffs were not entitled to a de novo trial, preceded by discovery, to test the regulations, since the rule-making procedure followed by the FDA, which resulted in voluminous comments, was adequate and the regulations were not irrational, arbitrary or capricious, which he deemed to be the standard of review. From this decision plaintiffs appeal.
 
 Discussion
 
 9
 Appellants have launched a multifaceted attack upon the challenged regulations and the district court's grant of summary judgment. They contend that the FDA has no authority to issue regulations having the binding effect of law, other than those regulations which must be issued under the adjudicatory hearing procedures provided by § 701(e) of the Act, 21 U.S.C. § 371(e).[5] They argue that regulations issued under § 701(a), which does not provide for a hearing, at best represent merely administrative interpretations of the substantive statutory law, enforceable only on a case-by-case basis that would insure de novo adjudication of all issues by the district court. They further assert that, even assuming arguendo that the FDA had the power to promulgate binding regulations, the present ones are deficient because they are unsupported by substantial evidence and the record fails to contain adequate findings and a sufficient explanation of the basis and rationale of the FDA's action to enable a reviewing court to determine whether the FDA acted within the scope of its statutory authority and on the basis of supporting evidence. They argue that the district court improperly used the "arbitrary, capricious" rather than the "substantial evidence" standard of review but that even the former could not be met here, in view of the inadequacy of the record, which fails inadequately to demonstrate the basis of the Commissioner's action.
 
 
 10
 If this case had been one governed by hearing requirements like those in § 701(e) or if the district court had held a de novo trial, appellants argue, crucial factual issues would have been resolved in their favor. They allege that they would have demonstrated that Vitamins A and D at the dosage levels specified in the regulations are not "drugs" as that term is defined in § 201(g) of the Act 21 U.S.C. § 321(g),[6] because they were not intended for use in the treatment or prevention of disease but as dietary supplements, and that they could not lawfully be classified as "prescription drugs" under § 503(b)(1)(B) of the Act, 21 U.S.C. § 353(b)(1)(B), since the products are not toxic at the level established by the regulations and are not inherently unsafe when used without prescription in a rational manner, but can become unsafe only when misused or used irrationally. The effect of the action of the FDA and of the district court, say appellants, is to withdraw a food from the market without a hearing and without findings, contrary to Congress' intent in enacting the prescription drug statute.
 
 The FDA's Rule-Making Authority
 
 11
 Resolution of the issues raised by appellants requires an analysis of the FDA's rule-making power and of the federal court's role in reviewing the exercise of that power. As enacted in 1938 § 701 of the Food and Drug Act, 21 U.S.C. § 371, contained two grants of authority to the FDA to promulgate regulations. Section 701(a) broadly grants:
 
 
 12
 "(a) The authority to promulgate regulations for the efficient enforcement of this chapter, except as otherwise provided in this section, is vested in the Secretary."
 
 
 13
 No conditions were expressly imposed upon this expansive grant of authority. A few paragraphs thereafter, on the other hand, Congress prescribed in §§ 701(e) and (f) an elaborate procedure that must be followed by the FDA in promulgating regulations with respect to certain specifically enumerated subjects (e. g., standards of identity, 21 U.S.C. § 341, branding of food for special dietary uses, 21 U.S.C. § 343(j), distribution of potentially contaminated foods, 21 U.S.C. § 344(a)), including notice, comments by interested parties, promulgation of proposed rules, filing of objections, a public evidentiary hearing if requested by a "party adversely affected," and a court of appeals review, 21 U.S.C. § 371(e)(f).
 
 
 14
 Congress did not expressly spell out the authoritative effect that should be given to regulations promulgated under §§ 701(a) and 701(e).[7] This naturally leads one to wonder, in view of the care with which Congress spelled out the elaborate § 701(e) procedure, whether it intended any limits on the apparently expansive delegation of the rule-making power granted by § 701(a), and specifically whether (as appellants urge) the latter was meant merely to grant authority to issue interpretive, non-binding advisory opinions with respect to matters of lesser importance than those promulgated here, which serve the rather important function of defining the status of a product as a food or drug and restricting certain products or prescription sale as drugs.
 
 
 15
 The FDA, like most federal agencies, does have power to issue "interpretive" regulations. Agency interpretations of substantive statutory law have been viewed as "not controlling upon the courts by reason of their authority," Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), but merely as "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," id. Appellants urge upon us the view that all regulations issued pursuant to § 701(a) are advisory only, and are subject to de novo challenge in court enforcement proceedings. This position has frequently been taken by members of the drug industry:
 
 
 16
 "Interpretative regulations ... issued pursuant to section 701(a) consist of FDA opinions of the meanings of various sections of the Act, and opinions as to the impact of those sections on particular fact situations. They have advisory effect only. That is, they tell private parties what the FDA position will be in an enforcement proceeding. But in that proceeding, the court must consider, on a full evidentiary showing, whether the particular conduct challenged by the FDA pursuant to its announced enforcement policy is a violation of the Act." Munsey, Survey of Current Legal Problems in the Drug Area, 23 Food, Drug and Cosmetic L.J. 449, 454 (1968).
 
 
 17
 See also Cody, Authoritative Effect of FDA Regulations, 24 Food, Drug and Cosmetic L.J. 195, 196 (1969).
 
 
 18
 A court may well consider it within its power to review the legality of some types of regulations which seek at length to flesh out the terms of a broad statute, especially when the regulations themselves are rather imprecise. In such cases a court in an enforcement proceeding will in any event be forced to develop a considerable factual record to determine whether there has been a violation of the regulation. But, as Judge Frankel observed, attempts to draw a hard and fast line between "interpretive" and "substantive" regulations have been rather unrewarding. The line of demarcation between the two is often far from clear. Faced with the argument advanced here by appellants we stated in Toilet Goods Ass'n v. Gardner, 360 F.2d 677, 686 (2d Cir. 1966), affd., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), "Neither do we think anything is to be gained by an attempt at comprehensive review of the decisions; the many cases in this area are not truly reconcilable ...." We have come to recognize that, if the administrative process is to be practically effective, specific regulations promulgated pursuant to a general statutory delegation of authority must be treated as authoritative, whether labelled "substantive" or "interpretive," especially in areas where the agency possesses expertise not shared by the courts. In that event its views are unlikely to be disturbed by the court in an enforcement proceeding. See, e. g., Abbott Laboratories v. Gardner, 387 U.S. 136, 151-152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); CIBA-GEIGY Corp. v. Richardson, 446 F.2d 466, 468 (2d Cir. 1971). Where once we may have demanded proof of specific delegation of legislative authority to an agency purporting to promulgate substantive rules we have learned from experience to accept a general delegation as sufficient in certain areas of expertise.
 
 
 19
 Whatever doubts might have been entertained regarding the FDA's power under § 701(a) to promulgate binding regulations were dispelled by the Supreme Court's recent decisions in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), and its companion cases, Ciba Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973). Those decisions interpreted § 701(a) as giving FDA the power to promulgate substantive regulations having the binding force of law rather than mere "interpretive" statements enforceable only on a case-by-case basis through plenary suits against those refusing to comply. The Court upheld the power of the FDA under § 701(a) to promulgate binding regulations which (1) defined the standards of evidence to be met by drug manufacturers called upon to demonstrate the efficacy of their products in new drug applications, and (2) permitted the dismissal without a hearing (i. e., by summary judgment) of an application failing to meet these standards. The Court further approved administrative determination by the FDA of whether a product was a "new drug" within the meaning of the Act. In sanctioning the equivalent of an administrative summary judgment procedure Justice Douglas, speaking for the Court, stated:
 
 
 20
 "If FDA were required automatically to hold a hearing for each product whose efficacy was questioned by the NAS-NRC study, even though many hearings would be an exercise in futility, we have no doubt that it could not fulfill its statutory mandate to remove from the market all those drugs which do not meet the effectiveness requirements of the Act." 412 U.S. at 621, 93 S.Ct. at 2479.
 
 
 21
 The same pragmatic view was taken with respect to the FDA's power to determine administratively the "new drug" status of a product, the Court stating that the FDA could not "administer the Act intelligently and rationally unless it has authority to determine what drugs are 'new drugs' ", 412 U.S. at 624, 93 S.Ct. at 2480, and continuing with the observation:
 
 
 22
 "To require separate judicial proceedings to be brought against each (drug manufacturer), as if each were the owner of a Black Acre being condemned, would be to create delay where in the interest of public health there should be prompt action. A single administrative proceeding in which each manufacturer may be heard is constitutionally permissible measured by the requirements of procedural due process." 412 U.S. at 625, 93 S.Ct. at 2481.
 
 
 23
 In Ciba Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973), the FDA's power to determine "new drug status" in definitive administrative proceedings, as distinguished from the power to seek such determinations in case-by-case enforcement proceedings, was established beyond any serious question. The Court held that a district court may properly defer to the FDA's primary jurisdiction, and observed that in providing the FDA with a "second line of defense"-injunction proceedings and seizure actions-"the Act does not create a dual system of control-one administrative, the other judicial," 412 U.S. at 644, 93 S.Ct. at 2498. Finally, the Court in Bentex Pharmaceuticals, supra, recognized the FDA's power to promulgate binding regulations not only for pragmatic reasons but on the ground that the FDA, by reason of its expertise, was better equipped to make such determinations than a court which is "without chemical or medical background," 412 U.S. at 652-653, 93 S.Ct. 2488, 37 L.Ed.2d 235.
 
 
 24
 These decisions clearly point to the conclusion that the FDA may promulgate regulations of the type challenged here. Congress' establishment of a specific (and elaborate) procedure in § 701(e) authorizing the FDA to promulgate regulations in certain fields was in addition to and not in derogation of the general rule-making power granted to the FDA by § 701(a). Under the latter section, furthermore, the FDA may follow streamlined procedures designed to avoid the endless delays that have tended to paralyze adjudicatory hearings and render them ineffective as a means of utilizing agency expertise.[8]
 
 
 25
 Our attention has not been directed to anything in the legislative history of §§ 701(a) and (e) that militates against these conclusions. On the contrary, over the last decade rule-making has been increasingly substituted for adjudication as a regulatory technique, with the support and encouragement of courts, at least where the regulation involves specialized scientific knowledge. See NLRB v. Wyman-Gordan Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1968); Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); National Petroleum Refiners Assn. v. FTC, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); Anaconda Co. v. Ruckelshaus, 482 F.2d 1301 (10th Cir. 1973); United States v. Florida East Coast Railway, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Where the objective is essentially legislative, i. e., to establish rules or principles by which an entire industry may be governed, the case-by-case adversary proceeding, in which the agency confronts a single alleged offender selected for suit with respect to a specific factual situation, has frequently proved to be an unsuitable method of enforcing the law, since it often resolves narrow issues of importance only to the immediate adversaries rather than broad questions of interest to the industry or the public. The rule-making proceeding, on the other hand, provides the agency with an opportunity first to receive a wide spectrum of views proffered by all segments affected by the proposed rule (e. g., manufacturers, vendors, doctors, consumers) and then in a legislative fashion to consider and choose from several alternatives or options rather than limit its decisions to narrow issues controlling a particular case. Furthermore, once binding regulations are promulgated, the industry and public are put on notice and may be guided accordingly rather than speculate as to the outcome of a seizure or enforcement suit. See Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921 (1965).
 
 
 26
 Whether the FDA's Rule-Making Power under § 701(a) Extends to "Prescription Drugs" as Defined in § 503(b)(1) of the Act
 
 
 27
 Appellants contend that, regardless what the FDA's rule-making power under § 701(a) may be with respect to other matters, the legislative history of the "prescription drug" statute, § 503(b)(1) of the Act, 21 U.S.C. § 353(b)(1), demonstrates that Congress intended to deny the agency the power to make binding rules specifying those products that would require a prescription. Congress, they argue, intended that the FDA must seek resolution of that issue through case-by-case enforcement proceedings. We disagree.
 
 
 28
 The legislative history of the prescription drug statute, which was enacted by Congress in 1951 as the Durham-Humphrey Amendment to the Act, sheds no clear light on the question of what rule-making authority Congress assumed or intended that the FDA would have in deciding what drugs must be sold only on prescription. Differing versions of the amendment, as they appeared first in the House and later in the Senate, delegated varying degrees of power to the FDA and were the subject of differing interpretations by members of Congress. Delving into the House and Senate Committee Reports and statements by members of Congress on the floor, one can find expressions construing the agency's power as interpretative only, with the issue of whether any product was a prescription drug to be determined by the court in enforcement proceedings.[9] On the other hand, the Senate Report issued in support of the legislation as it was finally enacted, which should be deemed more authoritative than statements by individual Congressmen at earlier stages before amendments were made, see Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. O'Brien, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), indicates that Congress intended the FDA to exercise its rule-making powers under § 701(a) in order to "enforce" the statute.[10] Were we required to decide the question solely on the legislative history we would lean to the view that Congress expected the FDA, particularly in view of its expertise, to promulgate from time to time binding interpretations of the standards set forth in the prescription drug statute, subject to judicial review, rather than leave the decision to the courts, which lack the medical and scientific knowledge essential to such decisions. Whatever doubts we might have had on the question, however, have been resolved by the Supreme Court's interpretation of the FDA's rule-making power in Hynson and its companion cases. Surely an agency which possesses the power to determine administratively what products are "new drugs" has the authority to decide what products are "prescription drugs."
 
 
 29
 The Adequacy of the Procedures Followed by the FDA
 
 
 30
 Since § 701(a) of the Act, pursuant to which the challenged regulations were adopted, does not require an evidentiary hearing, the FDA was authorized to use the "notice and comment" procedure prescribed by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553(c), which provides:
 
 
 31
 "(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection."
 
 
 32
 This procedure has been generally recognized as adequate for the purpose of airing issues, evidence, and relevant factors to be considered by an agency in determining whether a rule is to be promulgated and, if so, its terms. See, e. g., National Petroleum Refiners Assn. v. FTC, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).
 
 
 33
 Before adopting the regulations the FDA scrupulously followed the procedure prescribed by § 4. Appellants and all others concerned were given ample notice of the proposed action and an opportunity to submit documents, data and arguments. Many groups including appellants took advantage of this opportunity and submitted extensive and detailed comments containing medical and scientific data, analyses, criticism, suggested revisions and alternative proposals. These extensive submissions were collated by the FDA in some 46 folders. Appellants not only set forth their own views and data in detail but were permitted to examine the opposing comments and data submitted by others and to examine and criticize the medical literature relied upon by the FDA. It is undisputed that the FDA gave consideration to this mass of information in deciding whether to promulgate its proposed regulations. Since the decision did not turn on precise factual issues or on the credibility of witnesses but represented a judgment based upon consideration of relevant medical and scientific data, we doubt that a trial-type adversary hearing would have shed any further light on the question of whether restriction of the sale of higher dosage levels of Vitamins A and D to prescription sale would be in the public interest. The question was one to be resolved on the basis of a general appraisal of the risk of toxicity. It is conceded that even with the regulations in effect a purchaser of preparations containing less than the IU content required for prescription could suffer the effects of excessive ingestion by consuming a larger number of the less potent dosage forms. However, the Commissioner believed from experience that the regulations would lessen the risk of excessive intake that would be presented by the availability across the counter of higher potencies in single dosage units.
 
 
 34
 Appellants contend that the district court erred in applying the "arbitrary, capricious" rather than the "substantial evidence" standard prescribed by 5 U.S.C. § 706(2)(E). We disagree. Section 706(2)(E) is restricted to agency action in which an evidentiary hearing is required. Since no such hearing was required in the present case the appropriate standard for review of a regulation promulgated pursuant to the "notice and comment" procedure has been recognized to be that specified by 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to hold unlawful and set aside agency action, findings and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See National Nutritional Foods Assn. v. FDA, 504 F.2d 761, 773 n. 8 (2d Cir. 1974); Consumer of Union of United States v. Consumer Product Safety Commission, 491 F.2d 810 (2d Cir. 1974). Although the Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), referred to the substantial evidence test in connection with rule-making proceedings under 5 U.S.C. § 553, it later made clear in Hynson that this standard applies only to proceedings which are the subject of hearing provisions provided by 5 U.S.C. §§ 556 and 557 or to review of the record of an agency hearing provided by statute and that it did not apply to regulations promulgated by the FDA pursuant to § 701(a) of the Food, Drug and Cosmetic Act. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. at 622 n. 19, 93 S.Ct. 2469, 37 L.Ed.2d 207. See also Camp v. Pitts, 411 U.S. 138, 140-141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam).
 
 
 35
 The requirement in 5 U.S.C. § 553(c) that an agency promulgating rules pursuant to the "notice and comment" procedure "incorporate in the rules a concise general statement of their basis and purpose" certainly does not require the agency to supply specific and detailed findings and conclusions of the kind customarily associated with formal proceedings, Consumer Union of United States v. Consumer Product Safety Commission, 491 F.2d at 812. But this provision does not lessen or excuse the agency's obligation to publish a statement of reasons that will be sufficiently detailed to permit judicial review, Automotive Parts & Accessories Assn. v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968), and even under the "arbitrary, capricious" standard agency action will not be upheld where inadequacy of explanation frustrates review. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Indeed the very absence of a detailed record of the type that would be made if an evidentiary hearing were held makes it advisable for the agency, in lieu thereof, to provide a thorough and comprehensible statement of the reasons for its decision. Where the agency's finding is not sustainable on the administrative record made, then the ... decision must be vacated and the matter remanded to (the agency) for further consideration." Camp v. Pitts, 411 U.S. at 143, 93 S.Ct. at 1244; cf. Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S.App.D.C. 231, 462 F.2d 846, 850 (1972) (remanding to the agency for explanation of the basis of its finding).[11]
 
 
 36
 A failure of the agency adequately to explain its actions is not a warrant to the district court to conduct a de novo evidentiary hearing, Camp v. Pitts, supra. "(T)he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." 411 U.S. at 142, 93 S.Ct. at 1244. Instead, the remedy under these circumstances is "to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." Id. at 143, 93 S.Ct. at 1244; cf. Kennecott Copper Corp. v. EPA, supra.
 
 
 37
 Applying the foregoing principles here, a serious question is raised as to whether the Commissioner, in concluding that the higher level dosage forms of Vitamins A and D are "drugs," acted "in accordance with law," as that phrase is used in 5 U.S.C. § 706(2)(A). The question is posed by § 201(g) of the Act, 21 U.S.C. § 321(g), which defines a "drug" as an article recognized in the United States Pharmacopoeia or "intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease." Protection of the public health dictates that these definitions be construed liberally and that the FDA's determination be given considerable weight, United States v. An Article of Drug-Bacto-Unidisk, 394 U.S. 784, 792, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1968), provided it is not unreasonable, Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and has some support in the record, Camp v. Pitts, supra, 411 U.S. at 143, 93 S.Ct. 1241, 36 L.Ed.2d 106. Judge Frankel dismissed quickly the argument that Vitamins A and D were improperly classified as drugs, stating simply that "the products here are squarely within the literal language and evident meaning of the statute." However, since the district court's determination this court decided National Nutrition Foods Assn. v. FDA, 504 F.2d 761 (2d Cir. 1974) ("NNFA v. FDA" herein), which suggests that a greater inquiry by the district court is required. In that case, upon a petition to review FDA regulations fixing standards of identity and label statements for vitamin supplements sold as foods, which had been promulgated after an evidentiary hearing under § 701(e) (3) of the Act, 21 U.S.C. § 371(e)(3), we invalidated § 125.1(h),[12] which provided that any product containing more than the upper limit of the U.S. RDA per serving or daily recommended quantity (apparently 8,000 IU of Vitamin A and 400 IU of Vitamin D) is a drug. Judge Friendly reasoned that, although vitamins may be listed in the U.S. Pharmacopoeia or official National Formulary, this fact was not relied upon by the parties or the FDA as the reason for classifying these potencies as drugs and it represented at best a post hoc rationalization which would not suffice to validate the regulation, see Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 907 (1962). He further concluded that the argument would in any event prove too much, since it would require that all vitamin preparations, including those of less strength, which were treated by the FDA as dietary supplements, be classified as drugs.
 
 
 38
 Since the record indicated that a significant number of persons, principally women taking oral contraceptives, used the higher dosage levels for nutritional purposes, Judge Friendly found that the record did not reveal sufficient evidence that such preparations were intended for therapeutic purposes to satisfy the "substantial evidence" standard, which controlled upon review of a regulation promulgated under § 701(e), and that the evidence of therapeutic intent or use must consist of "more than demonstrated uselessness (of the higher level forms) as a food for most people."
 
 
 39
 Since the Commissioner, in determining the "drug" status of the higher dosage levels of Vitamins A and D in this proceeding, appeared to rely heavily on the same record and conclusions that formed the basis for the regulation challenged in NNFA v. FDA, appellants argue that the determination here must a fortiori be invalidated. We disagree. We are here dealing with regulations which (1) differ in material respects from § 125.1(h), (2) were promulgated under a different statute, § 701(a), and (3) are subject to a less stringent standard of review. We are not, however, in a position to determine whether application of the lesser standard of review would yield the same result as that reached with respect to § 125.1(h), since we do not appear to have the Commissioner's complete reasoning behind his classification of the higher dosage levels as drugs. Nor does it appear that we have been furnished with the entire record that formed the basis of the FDA's classification.
 
 
 40
 Upon adoption of the regulations the Commissioner stated that since there was no evidence that the higher dosage levels were used for nutritional purposes except for use of Vitamin D by a limited number of persons with poor Vitamin D absorption needing up to 1,000 IU daily, they "are therefore appropriate only for therapeutic purposes and thus properly classed as drugs." As Judge Friendly said, "demonstrated uselessness as a food for most people" would not automatically establish that the higher levels qualify as a "drug" within the definition in § 201(g)(1). The statute requires a finding of intent that a product be used for therapeutic purposes, and the Commissioner made no such finding. However, in his earlier statement proposing the regulations here under review the Commissioner stated that "there is widespread promotion to the laity of excessive quantities of these vitamins for prophylaxis and treatment of a variety of diseases and disorders." This statement indicates that the Commissioner, upon promulgating the regulations, may not have fully stated his reasons for classifying the higher levels as drugs. It is conceivable, for instance, that the Commissioner had before him information demonstrating that the higher dosage forms were used almost exclusively for therapeutic purposes. Measuring intent on an objective basis, as it must be, he may have concluded that in view of the extremely small percentage used for nutritional purposes Vitamin A and D at higher dosage levels were intended for use in the "cure, mitigation, prevention or treatment of disease." In that case his action could hardly be arbitrary or capricious and the regulations could, consistently with NNFA v. FDA, be upheld.
 
 
 41
 Furthermore, there are several differences between the proceeding before the NNFA v. FDA court and that here. As to Vitamin A there is a difference between the upper level encountered in NNFA v. FDA (more than 8,000 IU) and that before us (more than 10,000 IU). Moreover, the present regulations, unlike § 125.1(h), specifically provide that one higher dosage form mentioned as being vended for nutritional purposes in NNFA v. FDA, i. e., Vitamin D up to 1,000 IU per dosage, may be used under medical supervision to meet nutritional requirements, provided it is so labelled. Unlike § 125.1(h), which declared on the basis of general reasoning that a broad range of vitamins and minerals are "drugs" when vended in dosages exceeding their RDA's, the regulations here are directed specifically at two vitamins, A and D. This suggests that the Commissioner may have engaged in a more detailed and specific consideration of these vitamins than was apparent in the § 125.1(h) proceeding. Finally, there appears to be evidence in the record, upon which the Commissioner may have relied, indicating that high potency vitamin products are labelled in such a way (e. g., "Take one a day or as directed by a physician") as to indicate a therapeutic use.
 
 
 42
 Since the foregoing differences may prove to be significant, invalidation of the regulations here under attack is not automatically mandated by our decision in NNFA v. FDA. The situation is substantially similar to that encountered in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and the remedy prescribed by the Supreme Court in that case appears to be appropriate here. Accordingly we remand the case to the district court with directions to conduct an Overton-type hearing (including such affidavits or testimony as to the Commissioner's reasoning as the court deems necessary) for the purpose of determining whether, upon the entire administrative record before the Commissioner, which the court should scrutinize, Silva v. Lynn, 482 F.2d 1282 (1st Cir. 1973), the Commissioner acted rationally in classifying the higher Vitamin A and D dosage levels as a "drug" within the meaning of § 201(g) of the Act, 21 U.S.C. § 321(g). If the district court concludes that the Commissioner acted rationally, the regulations may be upheld and the order granting summary judgment should stand. The Commissioner's action in requiring that the higher dosage levels be sold only upon prescription could in that event hardly be labelled arbitrary, capricious or contrary to law.
 
 
 43
 We reject petitioners' contention that because the higher dosage levels are not "inherently" unsafe but become unsafe only if used in violation of cautionary labelling they do not qualify as "prescription" drugs within the meaning of § 503(b) of the Act, 21 U.S.C. § 353(b). The broad language of § 503(b)(1)(B)[13] permits consideration of the various factors surrounding the use of a particular drug in determining that it "is not safe for use except under the supervision of" a physician. There was ample evidence before the FDA that Vitamins A and D, when consumed in large quantities over a period of time, can be acutely toxic. It was reasonable for the Commissioner to recognize that the risks of toxicity are increased by over-the-counter availability of readily ingestible, high dosage forms, and therefore he could rationally conclude that these forms have a "potential harmful effect."
 
 
 44
 The appellants' arguments that the Commissioner's determination is irrational because high concentrations of Vitamins A and D also occur in natural foods, use of which is not restricted, and because the Commissioner's rationale would also require drugs like aspirin to be placed on a prescription basis, must also be rejected. Although some ordinary foods contain potent doses of Vitamins A and D, there is no indication that these foods are consumed on the same regular basis as the easily ingestible pills. Indeed, the fact that many persons obtain significant quantities of these vitamins from ordinary foods increases the risks of toxicity from regular consumption of high dosage pill forms. Likewise, although consumption of aspirin in excessive quantities presents risks of toxicity, there is no evidence that aspirin is consumed on the same regular basis as vitamins. The FDA here was not confronted with a case in which there was the mere possibility that a drug would be occasionally misused but one in which the actual way in which the product is apparently used on a normal basis by many persons presents serious risks of toxicity. The Commissioner's action in classifying the higher dosage forms as "prescription drugs" thus cannot be called irrational or arbitrary.[14]
 
 
 45
 If, however, the district court concludes on remand that the Commissioner's treatment of the higher dosage forms as "drugs" under the § 210(g) definition, based on the record before the Commissioner, is irrational, then the order granting summary judgment must be vacated.
 
 
 46
 The case is remanded to the district court for further proceedings not inconsistent with the foregoing.
 
 LUMBARD, Circuit Judge (concurring):
 
 47
 I am not as confident as my brothers that Congress intended the FDA to have substantive rule-making authority with respect to the prescription status of drugs. However, in light of the bare statutory language of section 701(a), 21 U.S.C. § 371(a), the lack of clear legislative history denying such power to the FDA, and recent judicial trends, see, e. g., Mourning v. Family Publication Services, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); National Petroleum Refiners Assn. v. FTC, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), there seems little doubt that these regulations would be upheld by the Supreme Court.
 
 
 48
 What motivates this brief concurring statement is my concern that substantive agency action receive adequate review in the courts. What Congress intended in 1938, when the FDA was created, is less than clear with respect to the exercise of substantive rule-making powers under such a provision as section 701(a). However, in light of the fact that the FDA did not choose to exercise such power for so many years after it was supposedly granted, it would be less than realistic to think that Congress gave such rule-making much thought when it passed the Administrative Procedure Act in 1946.[1] Consequently, the quality and nature of judicial review of such rule-making as occurred here is open to some speculation.
 
 
 49
 As Judge Mansfield points out, the Administrative Procedure Act provides that the proper scope of review here is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is so despite the fact that Congress provided a different form of review-one which required the FDA's actions to be based on substantial evidence-when it specifically authorized the FDA to engage in substantive rule-making. See 21 U.S.C. § 371(e), (f).
 
 
 50
 Courts have chosen to uphold ever more generously and liberally the exercise of substantive rule-making powers by administrative agencies. Consequently it seems to me only appropriate that when courts approve such broader powers, they give due consideration to whether analogous changes may be needed in judicial interpretation of the Administrative Procedure Act. In cases such as this, where an agency engages in substantive rule-making under the authority of a general rule-making authorization, the courts should interpret the phrase "arbitrary, capricious, (or) an abuse of discretion" so as to ensure that real judicial review of agency action is provided. A district judge should carefully examine the information that was before the agency to see if it gives adequate and substantive support to the agency's position.[2] While a court should not substitute its views for those of the agency, it should not think that the "arbitrary (or) capricious" standard is so loose that it must approve anything that an agency does so long as the agency's actions are not completely irrational. Indeed, in the area of substantive rule-making a court should not hesitate to overturn an agency's action if it is not fairly supported by the evidence before the agency. In essence I think that when an agency engages in substantive rule-making, it abuses its discretion (or acts arbitrarily or capriciously) if its actions are not supported by substantial evidence. Cf. 5 U.S.C. § 706(2)(E).
 
 
 51
 Although Judge Frankel applied the traditional "arbitrary (or) capricious" standard of review in this case, an examination of the language of his two opinions on these regulations suggests to me that he did conduct a review similar to what I espouse here. Indeed, at one point he states that he probably would have reached the same conclusion as the FDA did on a particular issue if he had initially been called to rule on it.
 
 
 52
 For these reasons, I concur.
 
 
 
 [1]
 Prior to plaintiffs' suit in the district court a petition for review of the FDA promulgation was dismissed by us for lack of jurisdiction. See Citizens for Truth in Nutrition v. FDA, Dkt. No. 73-2826 (2d Cir. Mar. 4, 1974)
 
 
 [2]
 See p. 1612, infra
 
 
 [3]
 "(b)(1) A drug intended for use by man which-
 "(A) is a habit-forming drug to which section 352(d) of this title applies; or
 "(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or
 "(C) is limited by an approved application under section 355 of this title to use under the professional supervision of a practitioner licensed by law to administer such drug,
 shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale."
 
 
 [4]
 21 C.F.R. § 80.1(f)(1) sets forth Recommended Daily Allowances for many vitamins and minerals, including Vitamins A and D as follows:
 U.S. GOVERNMENT RECOMMENDED DAILY ALLOWANCES (U.S. RDA'S) AND PERMISSIBLE
 COMPOSITIONAL RANGES FOR DIETARY SUPPLEMENTS OF VITAMINS AND MINERALS
 Children under 4
 years of age 1--
 Unit of Measurement U.S. RDA
 ---------------------------------------------------
 Lower Upper
 Limit Limit
-------------------------------------------------------------------------------
Vitamins
 Mandatory
 Vitamin A ............... International 1,250 2,500 2,500
 Units
 Vitamin D 2 .................. do 200 400 400
 Vitamin E .................... do 5 10 15
 Vitamin C ................ Milligrams 20 40 60
 Folic acid 3 ................. do 0.1 0.2 0.3
 Thiamine ..................... do 0.35 0.70 1.05
 Riboflavin ................... do 0.4 0.8 1.2
 Niacin ....................... do 4.5 9.0 13.5
 Vitamin B 6 .................. do 0.35 0.70 1.05
 Vitamin B 12 ............. Micrograms 1.5 3.0 4.5
Optional
 Vitamin D ............... International
 Units
 Biotin 4 ................. Milligrams 0.075 0.150 0.225
 Pantothenicdo ................................... 2.5 5.0 7.5
 acid.
Minerals Mandatory
 Calcium ..................... Grams 0.125 0.800 1.200
 Phosphorus 5 ................. Do 0.125 0.800 1.200
 Iodine ................... Micrograms 35 70 105
 Iron ..................... Milligrams 5 10 15
 Magnesium .................... Do 40 200 300
Optional
 Phosphorus 5 ................ Grams
 Copper ................... Milligrams 0.5 1.0 1.5
 Zinc ......................... Do 4.0 8.0 12.0
 
 
 [5]
 "(e)(1) Any action for the issuance, amendment, or repeal of any regulation under section 341, 343(j), 344(a), 346, 351(b), or 352(d) or (h), of this title shall be begun by a proposal made (A) by the Secretary on his own initiative, or (B) by petition of any interested person, showing reasonable grounds therefor, filed with the Secretary. The Secretary shall publish such proposal and shall afford all interested persons an opportunity to present their views thereon, orally or in writing. As soon as practicable thereafter, the Secretary shall by order act upon such proposal and shall make such order public. Except as provided in paragraph (2) of this subsection, the order shall become effective at such time as may be specified therein, but not prior to the day following the last day on which objections may be filed under such paragraph
 "(2) On or before the thirtieth day after the date on which an order entered under paragraph (1) of this subsection is made public, any person who will be adversely affected by such order if placed in effect may file objections thereto with the Secretary, specifying with particularity the provisions of the order deemed objectionable, stating the grounds therefor, and requesting a public hearing upon such objections. Until final action upon such objections is taken by the Secretary under paragraph (3) of this subsection, the filing of such objections shall operate to stay the effectiveness of those provisions of the order to which the objections are made. As soon as practicable after the time for filing objections has expired the Secretary shall publish a notice in the Federal Register specifying those parts of the order which have been stayed by the filing of objections and, if no objections have been filed, stating that fact.
 "(3) As soon as practicable after such request for a public hearing, the Secretary, after due notice, shall hold such a public hearing for the purpose of receiving evidence relevant and material to the issues raised by such objections. At the hearing, any interested person may be heard in person or by representative. As soon as practicable after completion of the hearing, the Secretary shall by order act upon such objections and make such order public. Such order shall be based only on substantial evidence of record at such hearing and shall set forth, as part of the order, detailed findings of fact on which the order is based. The Secretary shall specify on the order the date on which it shall take effect, except that it shall not be made to take effect prior to the ninetieth day after its publication unless the Secretary finds that emergency conditions exist necessitating an earlier effective date, in which event the Secretary shall specify in the order his findings as to such conditions."
 
 
 [6]
 "(g)(1) The term 'drug' means (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement of any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories."
 
 
 [7]
 The legislative history does confirm that § 701(e) regulations "are not merely interpretative. They have the force of law and must be observed." H.Rep.No. 2139, 75th Cong., 3d Sess. (1938), p. 12. However, there is no statement indicating that § 701(a) regulations were to have similar effect
 
 
 [8]
 The proceedings under § 701(e) at issue in NNFA v. FDA, for example, were begun in 1962, 504 F.2d at 768. The notorious proceeding which established standards of identity for peanut butter lasted more than 10 years. See Hamilton, Rulemaking on a Record by the Food and Drug Administration, 50 Texas L.Rev. 1132, 1142-45 (1972)
 Appellants contend that the use of a notice and comment procedure in this case was wholly gratuitous, and that the FDA can use procedures under § 701(a) so "streamlined" that objectants have no procedural rights. This is clearly not the case. When adopting a rule that purports to have the force of law, the agency is bound by the procedural requirements of § 4 of the Administrative Procedure Act, 5 U.S.C. § 553. Whatever the term "interpretive" may mean in other contexts, it seems apparent that the exemption from § 4 requirements provided in 5 U.S.C. § 553(b)(3)(A) for "interpretive rules" refers only to rules not intended to have the force of law.
 
 
 [9]
 The report of the House minority committee whose position generally prevailed in that chamber stated an objection to the prescription drug provisions since they
 "would make basic changes in the method of determining which drugs are dangerous and may be sold only on prescription, and which drugs are safe and may be sold over the counter. We think the present method, which leaves this determination to the courts, should be left unchanged except that a proper standard to be applied in determining whether a drug is dangerous should be incorporated in the statute." H.Rep.No.700, 82d Cong., 1st Sess. (1951), p. 28.
 The minority further suggested that providing the Federal Security Administrator with administrative power to list "prescription" drugs was "a dangerous delegation of authority" which would "add to the present difficulties by increased bureaucratic regulation." Id.
 
 
 [10]
 "In order to give this general definition a more precise meaning so that it may be applied with greater uniformity by the drug trade the Administrator can exercise the authority he has under section 701(a) of the Federal Food, Drug, and Cosmetic Act to issue interpretative regulations. It is to be understood that the inclusion of the statutory definition does not, of course, in any way derogate from the Administrator's authority to interpret and enforce the definition through the issuance of any regulations necessary or appropriate to protect the public from indiscriminate dispensing of drugs over the counter when they may be unsafe for use without the supervision of a practitioner licensed by law to administer such drugs." S.Rep.No.946, 82d Cong., 1st Sess (1951), pp. 4-5, U.S.Code Cong. & Admin.Serv. p. 2457
 "Furthermore, in determining whether a drug is safe for use without medical supervision, there must be taken into consideration not only the drug's toxicity, but also other potentialities for harmful effect, the method by which it is used, and the collateral measures necessary to its safe use. The broad language of the definition contained in this subparagraph is intended to comprehend all drugs that in fact should be administered under medical supervision in order to insure their safe use. Such difficult borderline cases as may arise under this definition can be dealt with under the interpretative and rule-making power provided for in section 701(a) of the act." Id. at 8-9, U.S.Code Cong. & Admin.Serv. pp. 2461-2462.
 
 
 [11]
 Although we have stated that regulations may be supported not only by the record but by the FDA's "experience," see Consumers Union of United States v. Consumer Product Safety Commission, 491 F.2d 810 (2d Cir. 1974), the agency's experience, to the extent that it provides a factual basis for a regulation under attack, must be a matter of record in order to qualify for consideration by a reviewing court
 
 
 [12]
 "(h) Any product containing more than the upper limit of the U.S. RDA per serving (or, where appropriate, per daily recommended quantity) of a vitamin or mineral as specified in § 80.1(f)(1) of this chapter is a drug, except for conventional foods which contain naturally-occurring amounts in excess of these limits or which contain added amounts in excess of these limits pursuant to § 1.8(e) of this chapter so that it is not nutritionally inferior to the food for which it substitutes and which it resembles, and except as provided for in a specific regulation for such special dietary foods as infant formulas or foods which are represented for use solely under medical supervision to meet nutritional requirements in specific medical conditions."
 
 
 [13]
 See fn. 3 supra
 
 
 [14]
 Appellants urge the decision in United States v. An Article of Drug-Decholin, 264 F.Supp. 473 (E.D.Mich.1967) as support for their position that the higher dosage form vitamins cannot be classified as prescription drugs. That case involved an effort by the Government to classify Decholin as a prescription drug because there was a possibility that if used in certain ways it could harm. The Decholin case is not in point however since there had been no proof at all of toxicity. Here, the appellants do not contest the findings of Vitamin A and D toxicity at least at very high levels. Moreover, in Decholin the court states:
 "(T)he Government itself all but concedes that if future unadvised laymen act as their predecessors have, the drug will not be responsible for any serious consequences.... (W)hile in theory Decholin may be harmful as an over-the-counter drug, in practice it is safe for use without prescription." 264 F.Supp. at 478.
 In our case, the Government takes just the reverse position-although higher dosage vitamin tablets may theoretically be safe if used as directed, they are in practice not safe for use without a prescription.
 
 
 [1]
 Another example of an agency recently deciding that a long-standing statute authorized the issuance of substantive rules is provided by National Petroleum Refiners Assn. v. FTC., supra
 
 
 [2]
 Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, requires that an agency give "a concise general statement of (the) basis and purpose" of rules that it adopts. As Judge Mansfield notes, an agency has an obligation to publish a statement of reasons that is sufficiently detailed to permit judicial review. Opinion at 701