KATHARINE GIBBS SCHOOL (INCOR-
PORATED) et al., Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 1123, 1124, 1126 to 1130, 1135, 1137 to
1139, 1141 and 1310, Dockets 78–4202,
78–4206, 78–4209, 78–4210, 78–4214, 78–
4215, 79–4007, 79–4017, 79–4039, 79–4046,
79–4057, 79–4064 and 79–4073.

United States Court of Appeals,
Second Circuit.

Argued June 11, 1979.

Decided Dec. 12, 1979.

On Rehearing En Banc March 17, 1980.

Judge OAKES, Circuit Judge, dissents in
an opinion in which MANSFIELD and
NEWMAN, Circuit Judges, join.

1. Section 18 provides in part:
   (a)(1) The Commission may prescribe—
   \*   \*   \*   \*   \*   \*
   (B) rules which define with specificity acts
   or practices which are unfair or deceptive
   acts or practices in or affecting commerce
   (within the meaning of section 45(a)(1) of
   this title). Rules under this subparagraph
   may include requirements prescribed for the
   purpose of preventing such acts or practices.

2. The Commission's petition for rehearing does
   not challenge the portion of the panel majority
   decision invalidating the Commission's regula-
   tions requiring schools covered by the rule to
   submit certain data concerning the school's job
   placement record to prospective students. 16
   C.F.R. § 438.3(b), (c) and (e). I share the pan-
   el's concern that § 438.3(e) appears to prohibit

OAKES, Circuit Judge (dissenting), with
whom MANSFIELD and NEWMAN, Cir-
cuit Judges, concur:

I dissent from the denial of the Federal
Trade Commission's petition for rehearing
en banc. The panel majority sets aside an
industry-wide, substantive trade regulation
rule because it is not set forth "with speci-
ficity" under § 18(a)(1)(B) of the Federal
Trade Commission Act, 15 U.S.C.
§ 57a(a)(1)(B), as added by the Magnuson-
Moss Warranty-Federal Trade Commission
Improvement Act, Pub. L. No. 93–637, 88
Stat. 2193, Title II, § 202(a).[1] In addition,
the majority strikes down the pro rata re-
fund provisions of the rule on the ground
that there is "no rational connection" be-
tween the refund requirements "and the
prevention of specifically [defined] enroll-
ment practices." 612 F.2d 658, at 664.[2]

Since this is the first opinion in any cir-
cuit determining the Commission's rulemak-
ing authority under § 18[3] and since the
majority opinion substantially impairs the
ability of the Commission to issue trade
regulation rules, the case is to me of excep-
tional importance justifying en banc scruti-
ny. It is not chauvinistic, I think, to say
that other courts look to the Second Circuit
in such matters, and it does not take away
from the valuable contributions made by
visiting, senior, and district judges to our
deliberations to point out that the two ac-
tive circuit judges on the panel split.

Stripped of technicalities, the trade regu-
lation rule at issue applies to proprietary

a school from including in its job-placement
statement a job-placement rate based on the
number of student actually contacted, although
I also find Judge Newman's more flexible inter-
pretation of the regulation rather persuasive.
Since the Commission does not seek review of
the majority's ruling on this point, however, the
Commission presumably intends to comply
with the panel opinion by permitting schools to
include such explanatory information in the
future.

3. Since the panel's decision in this case, the
   District of Columbia Circuit has also issued an
   opinion interpreting § 18. *American Optomet-
   ric Association v. FTC*, 626 F.2d 896 (D.C.Cir.
   1980).

vocational and home study schools the same rules that have been applied in a variety of federal, state, and local regulations to door-to-door salesmen of such diverse products and services as house siding, roof or chimney repairs, magazine subscriptions, hope chests, knife sets, pots and pans, and the like. *See* Sher, *The "Cooling-Off" Period in Door-to-Door Sales*, 15 U.C.L.A.L.Rev. 717 (1968). The rule provides that an enrollment contract must be given to the prospective student (16 C.F.R. § 438.2(a)); the prospective student must be given full rescission and refund rights during a fourteen-day "cooling-off" period (*id.* at (b), § 438.-5(a)); following enrollment, the school is required by § 438.2(c) to mail the prospective student information regarding its graduation and placement rates (meticulously and "with specificity" spelled out in § 438.-3;[4] the school is further required by § 438.2 to mail, on a separate sheet of paper, a notice entitled "HOW TO CANCEL THIS CONTRACT" required by § 438.6, which spells out "with [much] specificity" the exact kinds of notice to be given in eight carefully described situations, ranging from, *e. g.*, "correspondence courses without a separate equipment charge" to "residence courses without fixed class schedules with a separate equipment charge"; and the school must make a pro rata refund upon cancellation by the student after expiration of the "cooling-off" period (§ 438.4).[5] In short, these regulations are designed both to permit consumers—the prospective student—to get out of unwanted courses, in which they were deceived or pressured into enrolling, and to deter those vocational and correspondence schools which do use false, deceptive, or unduly high-pressure tactics to induce the unsuspecting, naive, or foolish to sign up.

The Statement of Basis and Purpose, 43 Fed.Reg. 60795 *et seq.*, which accompanied the rule, describes in detail the abuses that exist in this industry. Inclusion of a detailed catalog of unfair practices and acts in the rule itself would result in a lengthy, confusing, and ambiguous regulation which could only lead to difficulty for the schools affected as well as difficulty in enforcement of the regulation. The adopted regulations—by following the now routine method of permitting consumer rescission, requiring notice to this effect, and providing information on school success—serve both to deter fraud and deception and to improve the consumer's chances of avoiding often grave financial harm from high-pressure salesmanship.

Whether one agrees with the foregoing nutshell analysis of the regulations or not, it is clear that the regulations are set forth with sufficient specificity to comply with the Magnuson-Moss Act. The language of § 18(a)(1)(B) nowhere requires the Commission to define "with specificity" the *past* instances of deception and abuse that caused it to enact the rule in the first place. Rather, § 18(a)(1)(B) merely requires the Commission to define "with specificity" what actually *are* unfair or deceptive acts or practices for the purpose of alerting those covered by the rule as to what is expected of them in order to comply with the rule. House Report No. 93–1107, which accompanied the House amendment that contained the specificity requirement adopted in substance by the Conference Committee, expressly stated: "Such specificity would require that any such rule *reasonably and fairly inform* those within its ambit *of the obligation to be met and the activity to be avoided.*" H.R.Rep. No. 93–1107, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 7702, 7727 (emphasis added). The Rule as promulgated provides such notice in great detail so that those covered clearly know what they must do to achieve compliance.

The panel majority's interpretation, requiring the Commission to specify in the rule itself the past deceptions and abuses

---

4. *See* note 2, *supra.*

5. The regulations make it very simple for a school to determine what its obligations are.

which formed the basis for the rule, would render superfluous § 18(d)(1), which requires such a list of findings and reasons underlying the rule to be set out in the Statement of Basis and Purpose accompanying the rule. The Statement here contains a thorough discussion of such findings and reasons. 43 Fed.Reg. 60795 *et seq.*[6] The majority thus misreads the specificity requirement of § 18(a)(1)(B) and imposes a completely unnecessary additional burden on the Commission in promulgating its rules.

To hold that Congress intended to place greater restrictions on the Commission's authority by enacting the Magnuson-Moss Act strikes me as totally inconsistent with that Act's legislative history and purpose which was to "codify the Commission's authority to make substantive rules for unfair or deceptive acts or practices . . . ." Conf. Rep. No. 93–1408, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News, *supra*, at 7763. As here, that authority had previously been used to promulgate rules that established affirmative requirements to eliminate unfair acts or practices described in a Statement of Basis or Purpose, as well as to declare particular practices unfair or deceptive. *See, e. g.,* the former Octane Posting rule, 16 C.F.R. § 422.1 (1978) (protecting consumers of gasoline referred to in 1974 Conf.Rep. No. 93–1408, *supra*, 1974 U.S. Code Cong. & Admin.News at 7764;[7] the rule prescribing a Cooling-Off Period for Door-to-Door Sales, 16 C.F.R. Part 429 (1980) (on which the rule at issue is largely based).

The panel majority also objected to the regulation's requirement of a pro rata refund by the schools for rescinding students as having "no rational connection" to the prevention of specific unfair or deceptive enrollment practices because it was "universally applicable." 612 F.2d 658, 664. If the panel struck down this refund remedy because it was not based on unfair and deceptive practices specifically described in the rule itself, the panel majority once again relied on its erroneous interpretation of § 18(a)(1)(B) and overlooked the fact that such findings are required by § 18(d) to be included in the Statement of Basis and Purpose. If the majority instead, as seems likely, invalidated the refund remedy because it believes that a "universally applicable refund requirement" is impermissibly overbroad in that the remedy applies to all institutions, whether or not found to have engaged in deceptive activity, and to all students who drop out, for whatever reason, then the panel majority has misconceived the nature of rulemaking and has misread § 18(a)(1)(B)'s authorization for preventive rulemaking.[8] In either case, the mere ambiguity of the majority opinion makes it impossible for the Commission to know what its duties are on remand.

Rulemaking necessarily is an "essentially legislative" and hence prospective function "to establish rules or principles by which an entire industry may be governed." *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 698 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975). By design § 18 permits the

---

6. It should be noted that this Statement of Basis and Purpose is not itself subject to judicial review, § 18(e)(5)(C), although this language has caused some confusion. *See American Optometric Association v. FTC, supra* n. 3, at 905–906.

7. The rule governing Octane Posting and Certification is now contained in 16 C.F.R. § 306 *et seq.* (1980). The former rule was upheld as within the Commission's substantive power in *National Petroleum Refiners Ass'n v. FTC*, 157 U.S.App.D.C. 83, 482 F.2d 672 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

8. Despite the Commission's acknowledgement in its Statement of Basis and Purpose that the promulgation of 16 C.F.R. § 438.4 was not based on any finding that existing refund policies constituted unfair or deceptive trade practices, 43 Fed.Reg., *supra*, at 60809, the Commission has ample support for its refund requirement in § 18(a)(1)(B)'s authorization to prescribe requirements "for the purpose of *preventing* such acts or practices." (Emphasis added.)

Commission to pursue its "statutory mission" at an industry-wide level rather than by costly and time-consuming individual complaints and adjudications. Conf.Rep. No. 93–1408, *supra,* 1974 U.S.Code Cong. & Admin.News at 7763. (We are advised that since 1972 the Commission has issued twenty-two complaints or consent decrees involving vocational schools.) I can only conclude that the panel majority, at least insofar as it holds that prospective remedial requirements "prescribed for the purpose of preventing [unfair or deceptive] acts or practices," note 1 *supra,* may be imposed only on concerns that have engaged in such acts in the past or do engage in them in the future, is usurping the function of another branch of government.

I regret that the majority of the active judges do not see here an issue justifying en banc consideration, if for no other reason than to clarify the Commission's mandate, but specifically because this circuit has always been a leading exponent of sound administrative law, looked to by other courts and commentators as well as by agency and private party alike. I can only hope that the Court which decided *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*[9] will examine this, in my opinion, unjustifiable intrusion into the administrative process.

9. 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).